RICE, APPELLEE, *v.* THE YELLOW CAB CO., APPELLANT.*

---

*Motion to certify the record overruled (37824), February 27, 1963.

184

(No. 25330—Decided December 28, 1961.)

*Mr. A. H. Dudnik, Mr. M. I. Nurenberg* and *Mr. H. Donald Zimmerman,* for appellee.

*Messrs. Burke, Haber & Berick* and *Mr. Thos. P. Meaney, Jr.,* for appellant.

SKEEL, J. This appeal comes to this court on questions of law from a judgment entered in the Court of Common Pleas of Cuyahoga County for the plaintiff against four defendants. The claim of the plaintiff is based on negligence. By the plaintiff's amended petition, it is alleged that the defendant Yellow Cab Company was, on the evening of May 15, 1956, at about 11:45 p. m., operating an airport limousine in a westerly direction over the "High Level Bridge" in Cleveland, Ohio. On that part of the bridge, with which the facts in this case are concerned, there are four traffic lanes, two for eastbound traffic and two for westbound traffic. The outside or curb lanes, in each case, are twelve and one-half feet wide, and the inner or center lanes for both east and west traffic are ten feet wide, the bridge having a double yellow line in the middle dividing the inner traffic lanes extending the length of the bridge. The amended petition also alleges that the driver of the limousine had been experiencing some engine trouble and that the limousine was operating in an erratic manner and that while being operated over the bridge, the limousine was caused to be brought to a sudden stop, unexpectedly and without warning, and without

lights. It is further alleged that when the limousine was thus brought to a sudden stop, another of the defendants in this action, who was driving west behind the limousine, was caused to change his course sharply to the left of the limousine and thereupon come into collision with an automobile proceeding easterly over the bridge, which last mentioned automobile (driven by another defendant) thereupon swerved to its left and collided with the automobile in which plaintiff was a passenger, which automobile was then standing but headed west in the inside lane for westbound traffic and some thirty feet or more to the east of the limousine.

The amended petition also alleges that on May 15, 1956, there was in full force and effect an ordinance which provided:

"No person shall stand or park a vehicle upon any bridge or other elevated structure upon a highway or within a highway tunnel."

In addition, it is alleged that the defendant Yellow Cab Company was negligent in stopping its limousine on the High Level Bridge so as to obstruct the free flow of westbound traffic; in knowingly operating the limousine on such bridge in a defective condition so as to endanger persons using such public highway; in operating a vehicle on the public highway, when it had not been reasonably and seasonably inspected to determine its fitness to be so operated; and in bringing such limousine to a stop without lights or other illumination in the night season.

The allegations of negligence against the remaining defendants are: First, as to the driver of the westbound automobile that came up behind the limousine: That he failed to maintain and operate said automobile under proper control or keep a proper lookout and in changing the course and direction of the automobile which he was driving when he could not do so with reasonable safety to other users of the street, particularly the plaintiff; and, second, as to the driver of the eastbound automobile: That he failed to maintain and operate said automobile under proper control or keep a proper lookout, that he operated said vehicle at an excessive rate of speed under the circumstances, that he changed the course of said automobile when such change could not be made with safety to others, and that

he failed to stop or divert the course of his automobile to avoid the collision referred to in plaintiff's petition.

All the well pleaded claims of the plaintiff were put in issue by separate answers of the three defendants.

From the judgment for plaintiff, The Yellow Cab Company instigated this appeal, claiming the following errors:

"1. The court erred in refusing to direct a verdict for the cab company.

"2. The court erred in overruling the cab company's motion for judgment notwithstanding the verdict.

"3. The verdict against the cab company is not supported by sufficient evidence.

"4. The verdict against the cab company is manifestly against the weight of the evidence.

"5. The verdict is excessive and induced by passion and prejudice.

"6. The court erred in its general charge.

"7. The court erred in giving plaintiff's special requests to charge.

"8. The court erred in refusing to give the cab company's special requests to charge.

"9. The court erred in his rulings on the admission and exclusion of evidence.

"10. The court erred in overruling the cab company's motion for new trial and supplemental motion for new trial.

"11. The verdict is contrary to law.

"12. For other errors appearing on the record."

Many of the facts contended by the parties stand uncontroverted. There is no question that at about eleven forty-five on the night of May 15, 1956, an airport limousine owned and operated by The Yellow Cab Company was being driven in a westerly direction over the Superior-Detroit High Level Bridge. After reaching that part of the bridge where the vehicular roadway narrows to four traffic lanes, two for eastbound traffic and two for westbound traffic, the limousine was being driven in the lane next to the curb, which lane is twelve and one-half feet wide. The lane next to the center (which center is marked by double yellow lines extending the length of the bridge) is ten feet wide. As the limousine proceeded west, the driver observed an automobile standing in the curb lane some one hundred fifty

feet or more ahead. It developed that this automobile had been in collision with an automobile ahead of it and that there were, in fact, two automobiles standing in the curb lane. The driver of the limousine, when approximately fifty feet from the obstruction in the curb lane and when traffic permitted him to do so, turned into the next or center westbound traffic lane, that is, he started to proceed around the stopped vehicles, and, as he did, his motor "went dead" and he coasted to a stop with the front end of the limousine almost up to the rear of the first automobile standing at the curb and about four or four and one-half feet north of the center line of the bridge with the rear right side and end of the limousine still very slightly in the curb lane. Moreover, there is no dispute about the fact that the cause for the motor "going dead" was that the control arm on the carburetor broke off. The break was flush with the carburetor housing. There was some evidence that the driver said that, as he approached the bridge or after he was on the bridge, he had experienced some trouble which was said to be in the nature of the racing of the motor, but there is no evidence that such experience was in any way connected with the sudden breaking off of the casting described as a part of the carbuetor control arm. There is also no dispute that, after the motor "went dead" and the limousine stopped, it could not be moved under its own power. The evidence shows that the driver remained in his seat not knowing the cause of the breakdown and was attempting to start the motor so he could proceed on to the airport and that the limousine continued to stand without the ability to move for at least two and one-half minutes and probably three or four minutes before the collision in which the plaintiff was injured took place, but in which collision the airport limousine was in no way physically involved.

It was a drizzling rainy night with some claim of fog, but the bridge was well lighted both by the street lights and the headlights of motor vehicles. One of the defendants testified that it was lit up like a Christmas tree, and the pictures taken within a few minutes after the accident show no limitation of visibility. Some evidence was introduced tending to show that after the limousine came to a stop, the lights (headlights and tail lights) were not burning, but this evidence, which was negative in character, was challenged by clear and convincing proof

that the lights were lit on the limousine during all the time it was standing on the bridge. The photographs introduced in evidence clearly show that when they were taken the lights were lighted. In any event, the absence of lights on the limousine was not a contributing factor to the accident which followed nor was it so contended by any of the parties involved, although the subject is discussed in the briefs.

After the limousine came to a stop, the defendant Dunlap, who was driving in a westerly direction in the center westbound lane, observed the standing limousine and brought his automobile to a stop four or five feet east of the stalled limousine. He blew his horn several times as he approached and after he stopped, indicating his desire to proceed. His testimony, in part, is as follows:

"Well, I blowed several times. Then I stopped and he was looking down like at his dash, like he was trying to get it started.
" * * *

"Well, after the traffic got tied up behind me, I kept on blowing and he stuck his hand out the window and waved for me to go around him.
" * * *

"Q. What did that indicate to you? A. For me it was— all right for me to come ahead, pull around him.

"Q. What did you then do, Mr. Dunlap? A. Well, right then, I still looked to see whether I had clear visibility or not to pull around him. I just didn't go on his hand signal to go around.

"Q. You looked? A. Yes, sir.

"Q. Did his vehicle—did his limousine block your view to the west to some extent? A. Yes, sir.

"Q. Did you have to do something by way of your moving your automobile to get a clear view to the west? A. Yes, sir.

"Q. I presume you intended to pass him and even go over the yellow line to do it? A. Yes, sir.
" * * *

"Q. All right. Now, tell me from there on what you did. A. Well, I took my foot off my brake and eased, started easing out. I eased out about three or four feet, just about to the center line, and then from the west, west side of the double yellow

line, I seen these headlights come at me and they were swerving up and down the double yellow line, and that's all that happened. He hit me. [The automobile going east was that driven by Critchfield, whose testimony will be considered later.]
"* * *

"Q. Now, was any part of your automobile, any of your left wheels, either of your left wheels over the center line or to the left of the center line at the time of the collision? A. No, sir."

This witness testified that Critchfield was driving between sixty and seventy miles per hour. The sequence that followed, as described by the pleadings, as herein set out, was that after colliding with and passing the Dunlap automobile, the eastbound automobile driven by Critchfield swerved to the left and collided headon with the Rice automobile, which was standing just to the north of the center line some distance behind the Dunlap automobile. The automobile driven by Critchfield skidded to a stop south of and facing the center line, some thirty feet to the east.

The accuracy of the statement of defendant Dunlap that the limousine driver "waived him around" is emphatically denied by the limousine driver and is put in considerable doubt by the testimony of Dunlap on cross-examination conducted during the cab company's case, who when trying to explain why he (Dunlap) had never made such claim, either in written statements taken after the accident or in his cross-petition filed in this case against the cab company, testified as follows, after stating that he was to the right of the center line when the collision occurred and after admitting that his testimony was in error when he said his car was driven back by the impact:

"Q. And in examining the cross-petition that you filed, Mr. Dunlap, is it not true that you never made one claim in your cross-petition that the driver of the Yellow Cab limousine waved you around? A. No, my attorney made that up.

"Q. Well, you told him what happened, did you not? A. Yes, I did.

"Q. And you signed it under oath? A. That's true.

"Q. And then is it true that nowhere in your cross-petition is there any allegation that you were ever waved around? A. He's the one who put this, who thought this up."

If the arm signal was given, it could not have been con-

sidered, under the circumstances, as indicating that it was safe to pass to the left of the center line. All that could have been intended would be that if the "horn blower" wanted to proceed he would have to go around the stalled limousine. No claim of negligence is pleaded based on this circumstance.

As further challenging the credibility of this witness, a photograph, received in evidence without objection, said to have been taken by a police officer (called by the plaintiff as her witness) before any of the automobiles involved were moved, shows the Dodge automobile of Dunlap alongside the limousine, with its rear left wheel on the center line and the front left wheel about three feet over to the south of the center line. This photograph also shows the front of the limousine at least four feet north of the center line, so that Dunlap's visibility to the west could not have been obstructed when he stopped as he testified he did at a point north of the center line.

The driver of the eastbound automobile (Critchfield, then 16 years old) that came into collision with Dunlap's automobile, as claimed in the plaintiff's petition, testified that he was driving east in the curb lane over the High-Level Bridge, that an automobile being driven in front of him slowed down, apparently to permit the driver to look at the collision on the other side of the bridge, that because the other driver was going so slowly he decided to pass him, and that the Ford he (Critchfield) was driving, which belonged to the father of his friend for whom he was driving, had only two gears, second and high. He also testified that it was necessary to shift into second gear to get up speed and that he turned into the passing or center eastbound lane to pass the automobile ahead. The record then shows:

"And so I pulled up beside the Nash, like I was passing it. I mean, I didn't see nothing until I just saw a headlight move out in front of me and that's all I remember of the accident."

He testified that he was on his side (South) of the center line when the collision occurred, that he was traveling about thirty-five to forty miles per hour, and that the collision took place so fast he did not have time to put on his brakes. The record further shows:

"Q. And how far would you say, Mr. Critchfield, to the best of your memory you were away from Mr. Dunlap's car

when it pulled out? A. I saw a flash. Then I hit him. I couldn't tell you where he was, I mean.''

From the foregoing testimony of the drivers of the only vehicles that were moving, the operation of which was the immediate and direct cause of plaintiff's injuries, it is perfectly clear that the negligence of either or both was the sole, proximate cause of the injuries suffered by the plaintiff. If Dunlap did not drive to the left of the center line and Critchfield did thus collide with Dunlap's vehicle, the sole responsibility would be that of Critchfield. The driver of the limousine could have played no actual part in causing the accident, since Critchfield testified that he did not see the limousine until after the accident happened. On the other hand, Dunlap, according to his testimony, turned out to have a clear view to the west. The limousine was at least four feet north of the center line, so it could not be an obstruction to Dunlap's view. If, therefore, Dunlap pulled out and over the center line in the face of immediate approaching eastbound traffic, which was clearly visible, whereby a collision resulted, the fault would be that of Dunlap unless, of course, execessive speed on the part of Critchfield became a contributing factor. In any event the conduct of either or both of these defendants was the immediate cause of plaintiff's injuries, and their testimony is the basis of the plaintiff's attempts to support her claims of negligence against The Yellow Cab Company.

While the plaintiff is not bound by the testimony of a defendant presented on cross-examination, there must be some showing or support of the facts contended by the plaintiff which are necessary to make out a case.

The testimony of these two witnesses does not support in the slightest the negligence alleged against the defendant Yellow Cab Company.

The only other fact witnesses who were at the scene of the collision when it occurred were the plaintiff's husband and a friend of the plaintiff who had been with them during the evening. This friend, Mr. Brewer, was driving west, behind or to the rear of the Rice automobile, and when Rice stopped behind Dunlap, Brewer stopped about a car length behind Rice but in the curb lane. He testified that he could see the Dunlap automobile standing in front of the Rice automobile somewhat

to the left, that is, with its front left side two or three feet over the center line and alongside the limousine. He testified that the Dunlap automobile did not move while it was in his view and that he first saw it when he was sixty to seventy feet away and that it stayed in and was in the same position when he coasted to a stop, at which time he was forty feet behind the Dunlap automobile, and that he was stopped three or four seconds before the Dunlap automobile and the automobile driven by Critchfield came into collision. This evidence does not support any part of the plaintiff's claims and is completely inconsistent with the testimony of Dunlap and Critchfield.

It must also be noted that the allegations of plaintiff's petition, wherein it is claimed that the defendant cab company's limousine came to a sudden stop causing the driver of a westbound automobile directly behind him (Dunlap) to change his course sharply to the left, thereupon coming into collision with an automobile moving east in the center eastbound traffic lane, are clearly not supported by any of the plaintiff's witnesses. There is no evidence that the limousine came to a sudden stop or that the driver behind him was confronted with an emergency caused by the limousine coming to a sudden stop. The only evidence on this claim is that the limousine "coasted to a stop" after "the engine died." There is no doubt that just as "the engine died" the driver of the limousine was attempting to pass two vehicles standing in the curb lane and that, when he came to a stop, the front left fender of his vehicle was four or four and one-half feet to the north of the center line of the bridge and in the center lane for westbound traffic with sufficient clearance to the right in the curb lane for traffic to pass to the right, were it not for an obstruction of other motor vehicles caused by a prior collision for which the cab company was in no way responsible. There is no claim of negligence pleaded based on the claim that the limousine came to a sudden stop.

Therefore, the question is presented as to whether, under the facts, in many respects undisputed, the defendant cab company violated the city ordinance quoted in plaintiff's petition as set out herein and whether, if in fact there was such a violation, such violation constituted negligence on the part of the defendant cab company, resulting proximately in or contributing to plaintiff's injuries.

There is no question that there is no parking lane provided on the Superior-Detroit High Level Bridge. One of the photographic exhibits shows a very high curb separating the vehicular roadway from the sidewalk with the uprights of the superstructure so close together that it would be impossible to park a motor vehicle clear of the travel lane on the sidewalk, so that if a motor vehicle becomes completely disabled, as in this case, there is no place other than the traffic lanes where it could stand until removed by the use of other equipment.

Joined with the question of whether the defendant cab company's stalled limousine in a lane of travel constituted a hazard to other users of the highway for which it could be held responsible, is the claim of the plaintiff that the defendant cab company was negligent in not discovering the defect which caused the limousine to stall and thus failed to use due care to avoid the breakdown which caused the obstruction, such failure being claimed as a proximate cause of plaintiff's injuries.

The only evidence in the record dealing with the care used in maintaining the limousine here involved, together with other automobiles used in the cab company's business, is that all such vehicles are inspected once a month. There is no evidence that such inspections were inadequate or not carried on with due care. There is no probative evidence that a reasonable inspection would have discovered the possibility that the control arm of the carburetor on this limousine was in a defective condition. Two expert witnesses having many years of experience testified that in all their experience as automotive service men they had never heard of a control arm breaking as happened by the undisputed testimony in this case as described by the mechanic who first inspected the limousine within a few minutes after it stopped. The plaintiff's rebuttal witness, called to testify on this subject, stated that he had worked on "thousands" of Stromberg carburetors and that this was the type of carburetor used on defendant cab company's limousine. He also testified that he could tell by looking at its picture, then in evidence, that the limousine was a 1954 six cylinder Chrysler. After explaining the parts of a carburetor (which he brought to court but which was not introduced in evidence), said to be a "Stromberg" like the one in defendant cab company's limousine, the witness was asked:

"Q. Have you seen any, in your experience, have you seen any broken control arms on a 1954 Stromberg carburetor? A. Very common to break."

This witness also testified:

"Q. How long have you been an automobile mechanic? A. Thirty-two years. I have been in the business, qualified '41."

The witness must have meant not over twenty years (as the witness was then 37 years old) although in the next question he gave the length of his service as an automobile mechanic as about nineteen years, nine years of which were spent in the United States Navy working on aviation engines. Upon cross-examination, he was asked:

"Q. All right and how many times in your life have you seen the throttle shaft clearly break off where it meets or comes out of the housing? The throttle shaft now I am asking you? A. Yes, twenty, thirty times."

In other words, in all his experience as an automobile mechanic of about twenty years, he had experienced one and maybe two of such incidents a year. Or if some reasonable figure can be ascribed to his claim to have examined "thousands" of Stromberg carburetors, which must mean at least three thousand, in which event in not more than one per cent of the carburetors examined did the witness find a broken control arm. This testimony of the only witness called by the plaintiff to testify on this subject completely refutes the claim of the plaintiff that the condition of the carburetor could have been determined by reasonable inspection or that the defendant cab company was negligent in failing to properly inspect its limousine or the claim of using a motor vehicle which it knew or should have known was in a faulty condition. Common knowledge completely destroys the value of a statement that Stromberg carburetor control wires are "very common to break."

It should also be observed that even if the carburetor was defective, and such fact should have been known to this defendant in the exercise of ordinary care, the operation of such a vehicle, if it were thus defective, could in no way under ordinary circumstances endanger other street users. All that could result from its operation would be that if the control arm did break the vehicle would come to a "coasting stop" as it did in this case, the proximate result of which would not endanger any-

body. The foreseeable result of injury to another is not such a danger to street users under the claimed defective condition of the carburetor here involved as could be asserted against a motor vehicle driver driving his automobile with knowledge that it is without dependable brakes or a steering mechanism which was to his knowledge so defective that its operation would in all reasonable probability result in injury to other street users. There is no credible evidence in this record that the cab company knowingly operated a motor vehicle which was in such dangerously defective condition that such operation would endanger the safety of other street users, particularly this plaintiff, nor is there any evidence whatever in this record to show a causal relation between the negligent operation of a defective vehicle, if in fact shown, and plaintiff's injuries.

This brings us to a consideration of the question of whether the stopping of the cab company's limousine in the center westbound traffic lane on the "High Level Bridge," caused by a mechanical breakdown, whereby the vehicle could not be moved under its own power, thus becoming a disabled vehicle, constituted a violation of the city ordinance above quoted.

Mention is made of Section 4511.66, Revised Code, by both appellant and appellee, in considering this question. It should be noted that this section has application where a vehicle can park off the improved part of the highway on highways outside a business or residence district. In the first place, there is no place to park off the roadway on the High Level Bridge, and, secondly, the location or place where the accident occurred in this case is in the very center of the business district of the city of Cleveland so that neither the prohibition against parking on the paved portion of the highway nor the circumstances under which the statute is not applicable apply to this case. It might be observed, however, that the last paragraph of this section might be considered as setting out the legislative policy of the state in support of the common-law rule on this question. The paragraph provides:

"This section does not apply to the driver of any vehicle which is disabled while on the paved or improved or main traveled portion of a highway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving the disabled vehicle in such position."

There being no provision excusing an act of stopping or parking a motor vehicle on a "bridge" as provided in the ordinance quoted (No. 9.0922), an examination of the common-law rule is appropriate. The cases are unanimous in holding that the "no stop" provisions of an ordinance or statute do not apply to vehicles which are disabled to the extent that it is impossible to avoid stopping. The case of *Jennings, Admx.,* v. *Mueller Transportation Co.,* 268 Wis., 622, 68 N. W. (2d), 565, was concerned with a fact situation where the driver of a tractor-trailer was attempting to turn the unit around in a farm driveway when, in the process and while the trailer was wholly across and at right angles with the highway, the right wheels of the tractor dropped over the edge of a concrete abutment of a cattle underpass so that it could not be moved except with the use of a derrick. While such unit was standing in that position, another truck driver collided with the standing trailer, whereby the driver was killed. The Wisconsin statute (Sec. 85.19 [1]) is quite similar to Section 4511.66, Revised Code, and paragraph (8) of the section provides:

"The provisions of this section shall not apply to the operator of any vehicle which is disabled while on the highway in such a manner or to such extent that it is impossible to avoid stopping or temporarily leaving such vehicle in such position."

In considering the claim of error for submitting a special verdict to the jury, in which the jury was requested to determine whether the defendant was negligent: "(b) In respect to parking, stopping, or leaving his vehicle standing on the highway?," the court said (in the syllabus):

"1. Where the driver of a combination tractor-trailer unit attempted to turn around on a highway by backing into a farm driveway, but during such turning operation the vehicle became stalled across the highway in such a manner that it could not be removed from the highway except by means of a wrecker, it was a 'disabled' vehicle within the meaning of sec. 85.19 (8), Stats., so that the provisions of sub. (1) against parking, stopping, or leaving a vehicle on the highway, etc., were inapplicable; hence, in an action arising out of a collision of another vehicle therewith, the special verdict should not have included questions inquiring as to the negligence of the driver of the combination unit with reference to the provisions of sub. (1), since his negligence

in the circumstances was not in stopping or parking but in the manner and place of turning the combination unit, as to which latter a question was properly included in the verdict."

Also, in the case of *Lockie v. Pence*, 5 Cal. App., 172, 42 P. (2d), 340, the first paragraph of the syllabus reads:

"1. In this action for damages for personal injuries sustained by plaintiff when an automobile which was being driven by her husband, and in which she was riding, crashed into the rear end of a loaded truck which was stalled on the paved portion of the highway at night because of a broken rear axle, the defendant was not guilty of negligence because of the manner in which the truck was parked, where the evidence showed without conflict that the truck suddenly broke down in a manner making it impossible for the defendant to move the same, which fact brought the case within the exception provided in section 136 of the California Vehicle Act."

Also, in the case of *Hill v. Dakota Warehouse Co.*, 67 S. D., 67, 289 N. W., 73, the court said, in considering the liability of a defendant whose vehicle, because of a breakdown, was parked or stopped on the paved portion of a highway in violation of a statute prohibiting parking on the improved portion of the highway (in the syllabus):

"Where defendant's stalled truck was parked so that two wheels were upon blacktop surface of icy highway, and driver of plaintiff's truck which was not equipped with chains on rear wheels, attempted to stop truck by use of brakes, as result of which he skidded into the parked truck, plaintiff could not recover for damage to his truck because of the alleged negligence of defendant in parking stalled truck on highway."

We return, therefore, to the plaintiff's allegations of negligence.

(1) That the limousine stopped so as to obstruct the flow of westbound traffic on the high level bridge.

Under the undisputed circumstances, the limousine came to a stop because of the breaking of the carburetor control arm without injury to the plaintiff. It then became a disabled vehicle that could not be moved. It was blocking only the greater part of one of the two westbound traffic lanes, there still remaining two eastbound lanes. Within the framework of this claim of negligence might be included plaintiff's assertion that

the defendant's driver should not have attempted to pass the stalled automobile ahead with his motor acting "erratically." There is no evidence that the intermittent "racing" of the motor within two hundred feet from the place where the carburetor control arm broke was a circumstance which should have warned a prudent driver that a complete breakdown was impending, nor was there a place where the driver could have driven out of the travel lanes of the bridge. His attempt to proceed was the exercise of the driver's judgment which in no way constituted negligence. The testimony of James Rice (plaintiff's husband) that, after the accident, the driver of the limousine told him he was experiencing motor trouble "all the way up the bridge," if it could be considered as substantive evidence, which under the circumstances is not so, would not change this result.

(2.) It (defendant cab company) knowingly operated the limousine when the same was defective and dangerous so as to endanger persons using the highway.

There is no evidence in the record to support this claim. The first time its operation disclosed the possibility of its being in a defective condition that might impede normal operation was within 200 feet of the place where it became a disabled vehicle.

(3.) It (defendant cab company) operated (said limousine) in the south lane for westbound traffic despite its dangerous condition instead of in the north lane so that when the limousine stopped, westbound traffic was obstructed.

Here again there is no evidence to support this claim. No rule is suggested that, where two or more traffic lanes are provided for traffic moving in the same direction, a vehicle cannot move from one lane to the other, if necessary, to pass an obstruction and when the move can be made in safety (Section 4511.33, Revised Code), and where it is impossible to move out of such traffic lanes, it is not negligent conduct to continue to drive in attempting to get beyond an area where stopping is prohibited so long as the vehicle continues to run.

(4.) It (defendant cab company) stopped without lights or other illumination in the night season.

While there is a conflict in the evidence as to whether the lights of the limousine were on after it came to a stop, the question of whether they were or were not burning is of no importance. Dunlap, who was the driver of the first automobile being

driven behind the limousine, saw it and stopped, so that there was no causal relation between the absence of lights, if that be the fact, and the tragedy-which subsequently occurred.

(5.) The limousine was not reasonably and seasonably inspected to determine its fitness to be operated on the public highway.

This alleged claim of negligence was considered in part at least under the second allegation of negligence. There is no evidence supporting or defining what care comes within the orbit of that used by prudent men or whether the conduct of the cab company measured up to reasonable requirements. But more important, there is no evidence which would support a claim that a reasonable inspection would have foretold the impending possibility that the control arm would break or that such a break, if it occurred, would endanger anyone.

In this record there is a total absence of evidence to support any of plaintiff's claims of the failure of the defendant cab company to perform a legal duty owed by it to the plaintiff proximately causing or contributing to her injuries. The law cannot base legal liability on the failure of a defendant to perform the impossible. After the limousine came to a complete stop, it was then a disabled vehicle, and in clear view for at least five hundred feet in either direction, and was thus standing for at least two minutes, and probably three or four minutes, before another moving vehicle came into collision with the vehicle in which plaintiff was a passenger. There could be no claim that the failure to remove the disabled vehicle between the time it became disabled and the subsequent collision of other vehicles constituted negligence. It was standing in the traffic lane of a thoroughfare at a point where there was no way to move it out of the traffic lane except to move forward or backward. Its position, thus standing still, could not be a proximate contributing cause of injuries sustained by reason of the independent intervening negligent acts of others. *Thrash, a Minor,* v. *U-Drive-It Co.,* 158 Ohio St., 465; *Wright* v. *Cincinnati, N. O. & T. P. Ry. Co.,* 107 Ohio App., 310.

Even though we come to this conclusion, which eliminates the necessity of considering errors not coming within the area of this decision, it seems appropriate to examine two or three of the claimed errors not considered above. The claim is ad-

vanced by the defendant cab company that the judgment is against the manifest weight of the evidence. A consideration of this question requires a complete portrayal of all the evidence submitted to the court and jury. While the certificate of the trial judge asserts that the bill of exceptions presented in this court contains all the evidence submitted by the parties, yet a reading of such bill of exceptions shows clearly that this is not the fact. Many of the fact witnesses tried to exemplify their description of the position of automobiles at particular times by the use of toy automobiles, shifting them from place to place on a board. There was no attempt in these instances to dictate into the record the descriptions thus visually exemplified to the jury. The same fault in the record is to be found in the attempted use of a carburetor as a means of explaining its operation, which was not put in evidence. In the absence of a complete exemplification of the testimony, including the use of visual aids, as well as the witnesses, a reviewing court cannot pass on the question of whether the judgment is against the manifest weight of the evidence.

The defendant cab company also assigns as error the court's ruling refusing it the right to cross-examine other defendants called for cross-examination by the plaintiff under the provisions of Section 2317.07, Revised Code. In this the court committed prejudicial error. The common-law right to cross-examine witnesses called by an adverse party is for the purpose of eliciting suppressed facts which will weaken or qualify the case of the party calling such witness. *Aluminum Industries, Inc.*, v. *Egan*, 61 Ohio App., 111. See, also, *State* v. *Browning*, 98 Ohio App., 8.

In 4 Jones on Evidence (Fifth Edition), 1697, Section 907, it is said, in part:

"* * * Cross-examination is a matter of absolute right of the highest value, lying at the base of our judicial system. Very generally the procedure is regulated by statutory enactment. * * *"

The statutes of Ohio (Section 2317.07, Revised Code) provide only the right to call an adverse party as for cross-examination with the provision that "the party calling for such examination shall not thereby be concluded but may rebut it by evidence." But even though the party calling such witness is

not concluded by his testimony, such fact does not mean that he is not called to give whatever support can be solicited from him to support the case of the party who made him a witness or to destroy adverse claims contended by other parties. So in a case in which there are other defendants whose interests are adverse to each other as well as to those of the plaintiff, a defendant whose interests are jeopardized by the testimony of such adverse defendant should be permitted the right to test the credibility of the witness and the accuracy of his fact testimony by cross-examination at the conclusion of the cross-examination by the party calling the witness.

In the case of *Legg* v. *Drake* (1853), 1 Ohio St., 286, the court was considering the limits to the right of cross-examination of an adverse party called to testify by another adverse party. The court said in the fourth paragraph of the syllabus:

"When a witness is produced and examined by a party in an action, even though he be interested to testify against the party calling him, the other party is not limited, in his cross-examination, to the subject matter of the examination in chief, but may cross-examine him as to all matters pertinent to the issue on the trial; limited, however, by the rule, that a party cannot, before the time of opening his own case, introduce his distinct grounds of defence or avoidance, by the cross-examination of his adversary's witnesses."

And on page 289 of the opinion, the court said:

"The error assigned on the other ground of exception to the ruling of the Common Pleas above mentioned, involves an inquiry as to the extent to which the cross-examination of a party to a suit may be carried when made a witness on the trial by the adverse party. The Act of March, 1850, to improve the law of evidence, authorizes the examination of any party to an action at law, as a witness by the adverse party, '*in the same manner and subject to the same rules of examination, as other witnesses are compelled to testify.*' When, therefore, a party in any action avails himself of this provision of the law, and makes his adversary a witness in the cause, he thereby waives the objection to his competency and places him on the same ground with any other witness in the case, both as to competency and as to credibility. So that when a party to the suit, is thus made a witness, he becomes competent for all purposes, and may be

subjected to cross-examination as any other witness, with a single qualification, that a cross-examination on behalf of the party himself called as a witness, with a view to his own impeachment, would be incompatible with his situation as both party and witness; for the reason that he could not allege his own want of credibility.''

On page 290, the court stated:

''But in the case of *Webster* v. *Lee*, 5 Mass. Rep., 334, it is distinctly settled, that where a witness is produced and examined by a party in an action, even though he be interested to testify against the party calling him; the other party may cross-examine him as to all matters pertinent to the issue on the trial, although the witness could not have been called and examined at his own instance in the first place. * * *''

In the case of *Edwards* v. *Martin*, 2 Ill. App. (2d), 34, 117 N. E. (2d), 864, 43 A. L. R. (2d), 994, the fourth paragraph of the A. L. R. headnotes reads as follows:

''Since a party called as a witness in a personal injury action under a statute authorizing his examination by the adverse party as if under cross-examination does not become the witness of the adverse party calling him, the co-defendant of the witness is not entitled to subject him to cross-examination as an ordinary witness but only on matters to which he testified on examination by the party calling him.''

The annotation following this case cites other cases of like import. See *Goehring* v. *Rogers* (1924), 67 Cal. App., 260, 227 P., 689.

The right to cross-examine a codefendant whose interests are adverse to other defendants in a negligence case must be particularly apparent where such adverse party is called by the plaintiff for cross-examination under the statute. The right to demonstrate through cross-examination inaccuracies in matters testified to on plaintiff's examination at the time the witness is thus presented is absolutely essential to a correct understanding of and the means of weighing the witness's testimony by the triers of the facts. Then too, if cross-examination is not then permitted, such adverse codefendant might be dismissed from the case before the defendant could call him for cross-examination when presenting his case, in which event, if such adverse defendant was then called, he would make him his wit-

ness and would be bound by his testimony. A statutory privilege conferring the right to cross-examine an adverse party should not be used to the disadvantage of other parties in the action, whose interests are not only adverse to the plaintiff but also to other defendants properly joined.

For the foregoing reasons, the judgment entered on the verdict of the jury for the plaintiff as against this defendant is reversed and final judgment is entered for the defendant Yellow Cab Company.

*Judgment reversed.*

KOVACHY, P. J., and HURD, J., concur.