JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff-appellant, Ellen Mueller ("appellant"), wife and Executrix of the Estate of William Mueller, appeals from the judgment of the trial court which, after a jury trial, found Defendant-appellee Dr. Marilyn McNamara ("appellee") not liable for the wrongful death nor the alleged negligent care of William Mueller. For the reasons set forth below, we affirm the judgment of the trial court.
 {¶ 2} On September 21, 2000, appellant filed a complaint against Dr. McNamara, several other doctors, Southwest General Health Center and other medical care corporations alleging that they negligently delayed the treatment of Mr. Mueller's stroke by delaying his transfer to another medical facility for further life-saving treatment, and that Mr. Mueller died as a proximate result of the combined and concurrent negligence of the defendants. Five defendants were dismissed without prejudice prior to trial pursuant to Civ.R. 41. At trial, there were three remaining defendants: Dr. Marilyn McNamara, Dr. Conrad Lindes and Southwest General Hospital. The apposite facts follow.
 {¶ 3} On September 16, 1999, Mr. Mueller visited his primary physician, Conrad Lindes, M.D., who admitted him to Southwest General Hospital ("Southwest") that same day to monitor his heart condition. On September 21, 1999, the day he was to be released from the hospital, Mr. Mueller suffered a stroke in his hospital room.
 {¶ 4} It is undisputed that on the morning of the 21st, Mr. Mueller spoke to the appellant about the details of his discharge and then at 9:00 a.m. received his medication without incident from hospital staff. Shortly thereafter, at approximately 9:49 Mr. Mueller was found by a dietician slumped over in his room and unresponsive.
 {¶ 5} Chong Lim, M.D. was the first physician to examine and assess Mr. Mueller's condition. The evidence presented indicated that at approximately 10:15 a.m. Dr. Lim ordered a CT scan to be completed immediately and at approximately 11:00 a.m. had Mr. Mueller transported to the intensive care unit ("ICU") for further care. In the ICU, Marilyn McNamara, M.D. was the intensivist on duty that day.
 {¶ 6} The sequence of events which took place after Mr. Mueller arrived in the ICU is in dispute. The appellant contends that the timing of events in this case was critical because, based on evidence which they presented at trial, they believe that Mr. Mueller was eligible to receive tissue plasmentogen activator ("TPA"), a treatment that is given to stroke victims to allow the repair of an occluded blood vessel, vein or artery to occur thus minimizing the physical effects of a stroke.[1]
This treatment which, in essence, dissolves the blood clot which resulted in the stroke, may be administered intravenously (through the veins) or intra-arterially (injected directly into the artery). It is agreed upon in the medical community that when administered intravenously, TPA is only effective if administered within three hours of the time a patient was known to be well. Similarly, intra-arterial TPA must be administered within six hours to be effective. In order for a stroke patient to qualify for TPA treatment, a CT scan must first be performed to determine that the stroke was a result of a blood clot rather than a hemorrhage.
 {¶ 7} At the time of Mr. Mueller's stroke, Southwest did not perform TPA therapy on-site. Instead, the hospital generally would perform an immediate CT scan to determine if the patient qualified for TPA treatment. If a stroke patient so qualified, the patient was life-flighted to University Hospitals for administration of TPA within the allotted time frame for which the drug would be effective. The appellant contends that the defendants were negligent in not ensuring that Mr. Mueller received the TPA within the six-hour time frame from the moment that his stroke was discovered.
 {¶ 8} At trial, Dr. McNamara testified on cross-examination that she was the intensivist on duty when Mr. Mueller was transferred to the ICU. She stated that Dr. Lindes was the primary care physician of Mr. Mueller on September 21, 1999, meaning that she would not write orders or take care of Mr. Mueller unless Dr. Lindes was aware of it. Dr. McNamara explained that because Southwest is an "open" ICU unit, every patient is admitted to the hospital by an attending physician, who is responsible for that patient. Nurses on duty will then call Dr. McNamara as the intensivist on duty only if that patient needs immediate medical care or if the primary physician is unavailable. Further, at Southwest, a patient's chart contains a "chip" which shows the attending admitting physician's name on it. The name on the chip indicates who is responsible for the care of that patient during that patient's stay. Often times, the care of a patient will be transferred to another physician, at which time the chip is changed to reflect the new physician's responsibility for that patient. Dr. McNamara described this as the "captain of the ship."
 {¶ 9} She testified that Dr. Lindes was the physician responsible for Mr. Mueller and that he would not have been able to be transferred to University Hospitals for TPA treatment without an order from Dr. Lindes. She also testified that the chip on Mr. Mueller's file indicated that Dr. Lindes was the physician responsible for him. On cross-examination, however, Dr. McNamara admitted that she could have transferred Mr. Mueller to another hospital with permission obtained from Dr. Lindes via telephone.
 {¶ 10} Dr. McNamara testified regarding the morning of September 21st. She testified that she recalled Mr. Mueller being transferred to the ICU at approximately 11:00 a.m. She stated that she reviewed Dr. Lim's assessment and plan for treatment, which stated, "plan number one, transfer to ICU; number two, CAT scan to rule out bleeding; number three, need observation closely for possible respiratory arrest." She stated that Dr. Lim's report had also noted that Mr. Mueller had severe left ventricular dysfunction, that is a congestive heart.
 {¶ 11} Dr. McNamara stated that when Mr. Mueller arrived in the ICU, she was concerned about his respiratory status and therefore proceeded to test his blood gas. She was also concerned about Mr. Mueller's heart condition. Dr. McNamara testified that she suspected that Mr. Mueller's stroke was massive based on his visible physical symptoms, and therefore focused her treatment on ensuring Mr. Mueller was stable before transferring him for a CT scan.
 {¶ 12} Dr. McNamara stated that she was aware that the window of time for the administration of intravenous TPA was three hours from the time the patient was last seen normal. She stated that she had read that Mr. Mueller was last seen normal at 8:00 a.m. in the morning. She testified that at that point, it was already 11:00 a.m. and she knew the window of time had expired. Dr. McNamara stated that she later learned from medication records that Mr. Mueller may have been seen normal at 9:00 a.m. She testified that these medication records are not kept with a patient's chart and therefore Mr. Mueller's was not immediately accessible to her. She further stated that even if she knew at the time that Mr. Mueller had been seen last as normal at 9:00 a.m., he still would not have been a candidate for intravenous TPA, given that it could not possibly have been administered within one half hour of his arrival at the ICU. Dr. McNamara testified that she believed Mr. Mueller was not a candidate for intravenous TPA, based on the time frame of events, and also based on contraindications she detected. These contraindications included: Mr. Mueller's heart condition, she suspected that Mr. Mueller had suffered a massive stroke, and a possible embolic origin of the stroke.
 {¶ 13} Dr. McNamara further indicated that she did not think that Mr. Mueller's respiratory status was safe enough to immediately administer a CT scan. She stated that there was a possibility that he could have gone into respiratory arrest during the scan and that this would have been too risky for Mr. Mueller.
 {¶ 14} Dr. McNamara testified that she did not speak with Dr. Lindes regarding Mr. Mueller until after the results of the CAT scan came back. However, Dr. Lindes testified that he spoke with Dr. McNamara prior to that. Dr. McNamara testified that that morning, she was told by the nursing staff that Dr. Lindes was "on his way over." She testified that she wanted Dr. Lindes to assess Mr. Mueller's condition before being sent for a scan. She also wanted to wait for him so that he could speak with the family, with whom Dr. Lindes had a relationship, and to glean additional information regarding his medical history. Knowing that his office was only ten minutes away, Dr. McNamara waited for Dr. Lindes to come to the ICU before sending Mr. Mueller for a scan. At that time, while Dr. Lindes was allegedly en route, Dr. McNamara left the ICU for reasons she presumed to be to attend to other patients. Dr. McNamara testified that she left the ICU. She also testified that the nursing staff failed to call her when Dr. Lindes was delayed and she was unaware that Dr. Lindes did not reach the ICU within the ten minutes that she thought it would take for him to get there from his office.
 {¶ 15} Dr. McNamara testified that she knew that the window of time for the administration of intra-arterial TPA was six hours. She also stated that, at the time, it was an experimental procedure and had not yet been approved by the FDA. Dr. McNamara stated that she discussed with Dr. Lindes treatment options, which included flying him via helicopter to University Hospitals for a possible intra-arterial TPA treatment. She stated that Mr. Mueller arrived at University Hospitals within between five hours and five hours and fifteen minutes of when he was last seen normal. However, she stated that Mr. Mueller never received the intra-arterial treatment because of the window of time, and also because of the extent of his stroke and because he had a quaiac positive emesis.[2]
 {¶ 16} Dr. Lindes testified that he was called at approximately 11:30 a.m. that morning. He stated that he told the staff at the ICU that he would be over on his lunch hour. Dr. Lindes testified that he knew a CT scan had been ordered and had spoken with Dr. McNamara about Mr. Mueller. He stated that while Dr. McNamara waited for him to arrive before sending Mr. Mueller for a CT scan, he did not think it would have been necessary for this to happen. He admitted, however, that there may have been medical reasons, such as ensuring Mr. Mueller's stability, for delaying transport before allowing the scan to be performed. Dr. Lindes testified that while he was the primary physician for Mr. Mueller, he did not consider himself the "captain of the ship" while he was absent from the ICU.
 {¶ 17} Dr. Lindes testified that he arrived at the ICU between 12:15 and 12:30, at which time Mr. Mueller still had not received a CT scan. He stated that he was concerned that the CT scan was not completed, and ordered that it be completed immediately. While Dr. Lindes admitted that he had the authority to transfer Mr. Mueller, he stated that one of his colleagues could have done so over the phone on his behalf. Dr. Lindes testified that Dr. McNamara was not in the ICU when he arrived, therefore he re-examined Mr. Mueller before sending him for a CT scan.
 {¶ 18} At trial, the appellant presented the expert testimony of Dr. John Conomy who opined, based on a review of information given to him, the testimony and evidence, that the time which elapsed between the discovery of Mr. Mueller as unresponsive to the time he actually had the CAT scan was too long. Specifically, he stated that the CT scan should have been performed immediately upon Dr. Lim's order and further that the life-flight procedure should have been initiated simultaneously with the CAT scan. Despite other testimony that the life-flight procedures could not be initiated until a patient is transferred with approval by a doctor at the current hospital and accepted by a doctor at University Hospital, Dr. Conomy insisted otherwise. Dr. Conomy further opined that Mr. Mueller was a candidate for TPA treatment, but that the delay in treatment rendered Mr. Mueller ineligible to receive intravenous TPA and, in essence, that this delay by various defendants resulted in the untimely death of Mr. Mueller. Dr. Conomy did acknowledge, however the factual dispute of this case and his lack of capacity to resolve such a dispute.
 {¶ 19} Dr. Rainey testified as an expert witness for Dr. McNamara. He agreed with the generally accepted standard that intravenous TPA should be administered within three hours for it be effective. Dr. Rainey opined regarding intra-arterial TPA and stated that it is unconventional therapy. Dr. Rainey further opined, that based on the medical records he reviewed, Mr. Mueller had suffered a massive stroke. Dr. Rainey testified that it was his opinion that Mr. Mueller was not a candidate for TPA and in fact, would likely have suffered from damage from TPA treatment had it been administered.
 {¶ 20} The appellant contends that Dr. McNamara was negligent in her care and caused the wrongful death of Mr. Mueller by her failure to act quickly enough to ensure that TPA could be administered by physicians at University Hospital.
 {¶ 21} The matter proceeded to a jury trial on October 9, 2001. The trial court granted a directed verdict in favor of defendant Dr. Conrad Lindes during the trial. On the final day of trial, the appellant settled with Southwest. Thereafter, the jury found in favor of appellee Dr. McNamara. It is from this ruling that the appellant now appeals, asserting three assignments of error for our review.
 {¶ 22} "I. The trial court abused its discretion in limiting plaintiff's cross-examination of defense expert Thomas G. Rainey, M.D., to one-half hour when defendants were allowed to cross-examine plaintiff's expert John Conomy, M.D. for two and a half hours."
 {¶ 23} In her first assignment of error, the appellant contends that the trial court erred in limiting her cross-examination of the defendant's expert witness, Dr. Rainey. Specifically, she asserts that she was prejudicially effected since the defendants were permitted to cross-examine her expert witness for a longer amount of time than she was permitted to cross-examine Dr. Rainey. Further, the appellant avers that in limiting her cross-examination, the trial court deprived her of the opportunity to elicit crucial testimony from Dr. Rainey regarding Dr. McNamara's liability. We disagree with the appellant's contention.
 {¶ 24} Pursuant to Evid.R. 611 (B), cross-examination shall be permitted on all relevant matters and matters affecting credibility. "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed absent a clear showing of an abuse of discretion." State v. Treesh (2001), 90 Ohio St.3d 460,2001-Ohio-4 citing State v. Acre (1983), 6 Ohio St.3d 140, 145. "Abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. The Supreme Court has explained this standard as follows:
 {¶ 25} "An abuse of discretion involves far more than a difference in * * * opinion * * *. The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an `abuse' in reaching such a determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." Huffman v. Hair Surgeon, Inc. (1985), 19 Ohio St.3d 83, 87.
 {¶ 26} Further, trial judges may impose reasonable limits on cross-examination based on a variety of concerns, such as harassment, prejudice, confusion of the issues, the witness's safety, repetitive testimony, or marginally relevant interrogation. Delaware v. Van Arsdall
(1986), 475 U.S. 673. Further, not all error pertaining to limitations on cross-examination is reversible error. State v. Long (1978),53 Ohio St.2d 91, 97-98.
 {¶ 27} In this case, the appellant's proffer demonstrated that she wished to question Dr. Rainey regarding his opinion on the time that it took for Dr. McNamara to stabilize Mr. Mueller and have a CT scan performed on him prior to transferring him. The appellant contends that Dr. Rainey testified in his deposition that Dr. McNamara could have just briefly checked to be sure Mr. Mueller was stable and without performing a CT scan transferred him.
 {¶ 28} At trial, Dr. Rainey testified that the time interval that elapsed between 11:00 a.m. to 2:00 p.m. in which Mr. Mueller was being stabilized and having a CT scan performed fell within the standard of care. He testified in this same regard in his deposition. The deposition transcript reveals:
 {¶ 29} "Q. In your opinion, doing those things, taking those steps, doing the CT scan determining whether he is stable, during that period of time, those three hours, that is within the standard of care, in your opinion?
 {¶ 30} "A. It is. * * *"
 {¶ 31} We find that the trial court did not abuse its discretion in limiting the cross-examination of Dr. Rainey. The appellant was able to introduce sufficient evidence that suggested her theory that the time that passed while Mr. Mueller was at Southwest prior to receiving a CT scan and prior to being transferred to University Hospitals was either too long or unnecessary. The jury, as trier of fact, had sufficient evidence before it to determine whether the standards of care were met with regard to Mr. Mueller's treatment.
 {¶ 32} Lastly, the appellant contends that her one-half hour cross-examination of Dr. Rainey was patently unfair when compared to the defense's two and one-half hour cross-examination of Dr. Conomy. Specifically, the appellant avers that the disparity alone in time spent cross-examining the experts was "unreasonable, unconscionable and undermines the fundamental concept of fairness inherent in the trial process." (Appellant's brief, p. 15) We disagree with this contention and note that the primary reason that cross-examination of Dr. Conomy lasted significantly longer than cross-examination of Dr. Rainey was because there were three defendants involved, each of whom were entitled to cross-examine Dr. Conomy.
 {¶ 33} Further, we can find no support for the contention that a failure to permit each side an equal amount of time for cross-examination of the other's expert witness is patently unfair and prejudicial.
 {¶ 34} "II. The trial court abused its discretion by allowing the defendants to question co-defendants as on cross-examination and by permitting defendants to cross examine each other's expert witnesses concerning issues on which the defendants were not adverse."
 {¶ 35} The appellant contends that the co-defendants in this case were not adverse because they agreed that Mr. Mueller was not a candidate for TPA treatment. As such, she contends that co-defendants should not have been able to cross-examination Dr. McNamara. Further, the appellant avers that the defendants should not have been allowed to cross-examine the other defendant's expert witness.
 {¶ 36} Pursuant to R.C. 2317.07 which states, in relevant part, "At the instance of the adverse party, a party may be examined as if under cross-examination * * *." The appellant cross-examined Dr. McNamara. Thereafter, defendants with an adverse interest as well as those adverse to the appellant, were entitled to cross-examine Dr. McNamara after the appellant cross-examined her in her case in chief.Mitchell v. Columbiana Cty. Mental Health Center, Columbiana App. No. 00 CO 46, 2001-Ohio-3472, citing: Rice v. Yellow Cab Co. (1961),117 Ohio App. 183, 200-202. See, also, Epling v. Pacific IntermountainExp. Co. (1977), 55 Ohio App.2d 59, 63; Geisler v. Akron City Hosp.
(Dec. 28, 1988), Summit App. No. 13716; Cross Country Inns, Inc. v.Habegger Corp. (Mar. 16, 1995), Franklin App. Nos. 94APE01-41,-42,-92,-93.
 {¶ 37} In this case, each defendant could have been held liable for separate acts occurring at different times. "Their defenses on breach of duty did not stand or fall together." Mitchell, supra. In fact, the appellant attempted to elicit testimony from Dr. McNamara on cross-examination that would fault Dr. Lindes for any delay in the administration of a CT scan. The following portions of Dr. McNamara's testimony was unfavorable to Dr. Lindes.
 {¶ 38} Dr. McNamara testified that she told the nurses in the ICU to wait until Dr. Lindes arrived before sending Mr. Mueller for a CAT scan (T.33). Dr. McNamara claimed that she waited for Dr. Lindes before allowing Mr. Mueller to have a CAT scan because she had concerns about his critical nature, she wanted Dr. Lindes to be involved in any decision regarding TPA treatment, and because she felt it was appropriate for Dr. Lindes to talk to the family (T.35-37). Dr. McNamara further testified that she thought Dr. Lindes was "captain of the ship" (T. 41). The appellant tried to get Dr. McNamara to admit that Dr. Lindes should have dropped everything when he received the call that Mr. Mueller was transferred to the ICU. (T. 44). The appellant, in essence, questioned Dr. McNamara in a manner that would demonstrate before a jury that Dr. Lindes may have been responsible for the delay in Mr. Mueller's treatment. Therefore, we find that Dr. Lindes' interest in evading responsibility for a delay in treatment, which may have rendered Mr. Mueller ineligible to receive TPA treatment, was sufficiently adverse to allow him to cross-examine Dr. McNamara.
 {¶ 39} The appellant further contends that the trial court abused its discretion in allowing the co-defendants to cross-examine Dr. McNamara's expert witness, Dr. Riggs. We address this contention with the next assignment of error.
 {¶ 40} This assignment of error is overruled.
 {¶ 41} "III. The trial court abused its discretion by permitting defendant Marilyn Mcnamara, M.D.'s expert witness — Jack Riggs, M.D. to quote directly from studies published in learned treatises."
 {¶ 42} In his third assignment of error, the appellant argues that the trial court abused its discretion by permitting the defense's expert witness to quote from a learned treatise on direct examination in contravention of Evid.R. 706.
 {¶ 43} Where an expert witness testifies at trial by videotaped deposition and objections were made during the deposition but not relayed to the trial court in a timely fashion, the objections are deemed waived. Coe v. Young (2001), 145 Ohio App.3d 499, 763 N.E.2d 652, citingSommer v. Conrad (1999), 134 Ohio App.3d 291, 298, 730 N.E.2d 1058; See also Zachariah v. Rockwell Internatl (1998), 127 Ohio App.3d 298, 304,712 N.E.2d 811; Rivera v. Lake Terminal RR. Co. (1999),132 Ohio App.3d 483, 489-491, 725 N.E.2d 676.
 {¶ 44} In this case, there is no indication that the appellant objected to the admission of the videotaped deposition of Dr. Riggs at trial. An appellate court will generally not consider any error that counsel could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected[.]" Statev. Peagler (1996), 76 Ohio St.3d 496, 499.
 {¶ 45} "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances, where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Goldfuss v.Davidson (1997), 79 Ohio St.3d 116, syllabus. In this case, the questionable testimony was not legally prejudicial to the appellant. Nearly the exact testimony elicited by the defendant's expert witness about which the appellant now objects had already been elicited through impeachment on cross-examination of the plaintiff's expert witness, Dr. Conomy. We cannot find that allowing Dr. Riggs' full deposition testimony at trial where counsel had an opportunity to object before the trial court undermines the integrity of the judicial process. We therefore do not find plain error in this case.
Judgment affirmed.
It is ordered that appellees recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MICHAEL J. CORRIGAN, P.J., AND JAMES J. SWEENEY, J., CONCUR.
N.B. This entry is an announcement of the court's decision. See App.R.22(B), 22(D) and 26(A); Loc.App.R.22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also S.Ct.Prac.R. II, Section 2(A)(1).
[1] TPA is genetically engineered and became available in clinical trials in the early 1990's. By the mid 1990's, it became available for use in medical institutions, however, was used primarily in stroke centers and larger hospitals with adequate resources to properly administer it.
[2] Upon arrival at University Hospitals, Mr. Mueller would have been subjected to another CT scan by University Hospital doctors and further evaluation to ensure he was a candidate for intra-arterial TPA.