**COE, Admr., et al., Appellants,**

v.

**YOUNG et al., Appellees.**

[Cite as *Coe v. Young* (2001), 145 Ohio App.3d 499.]

Court of Appeals of Ohio,
Eleventh District, Ashtabula County.

No. 2000–A–0022.

Decided Aug. 27, 2001.

500

*Michael J. Drain* and *Walter E. Thayer,* for appellants.

*William E. Riedel,* for appellees.

NADER, Judge.

On July 23, 1993, at approximately 10:30 p.m., a motorcycle-tractor accident occurred on U.S. 322, a two-lane highway, in Ashtabula, Ohio. The parties to this

appeal are Michael Coe, individually, Michael Coe, administrator for the estate of Marjorie Lynn Coe, appellants, and William A. Young, individually, and William A. Young, d.b.a. Wagner Farms, appellees. Appellee, William A. Young, a dairy farmer, was driving a 1955 Farmall tractor pulling a small trailer. Appellant, Michael Coe, was operating a 1959 Harley–Davidson motorcycle with his wife, Marjorie Coe, as his passenger.

The tractor and trailer were both equipped with slow-moving vehicle ("SMV") signs. The tractor's red rear light had been replaced with a white light. Appellee carried a large flashlight which he used to signal his presence to motorists approaching from behind. The tractor and trailer were traveling approximately seven miles per hour. The posted speed limit was fifty-five miles per hour.

Appellant approached the tractor and trailer from the rear; there is no evidence that appellant was speeding. Appellant did not see the tractor and trailer until it was too late. In an attempt to pass the tractor and trailer and avoid a collision, appellant maneuvered the motorcycle towards the right hand berm. In doing so, the motorcycle struck the right rear wheel of the tractor causing appellant to lose control of the motorcycle. The motorcycle fell onto its side. Both appellant and his wife were thrown from the motorcycle. As a result of this accident, appellant sustained serious injuries and his wife was pronounced dead at the scene.

Appellant had been drinking alcoholic beverages on the day of the accident, although there is contradictory evidence of the amount. His blood-alcohol concentration after the accident was .08 milligrams per deciliter, below the legal limit for driving under the influence, pursuant to R.C. 4511.19(A)(3). Both appellant and his wife were wearing helmets.

On January 12, 1995, appellant, individually and as the administrator of Marjorie Coe's estate, filed a suit, based in negligence, against appellees; on November 3, 1998, appellant dismissed the suit, pursuant to Civ.R. 41(A). Subsequently, the estate of Marjorie Coe entered into a settlement with appellees' insurance company.

On March 18, 1999, appellant renewed his claim against appellee. A jury trial commenced on February 23, 2000. At the close of the case and prior to closing arguments, counsel for appellees moved that testimony of four of appellant's witnesses be stricken from the record. Appellant objected to the motion. The trial court judge granted appellee's motion based on his determination that Henry Lipian, David Schneider, Caroline Wolfe, and Norman Eckel did not indicate that they were able to give their "opinions within the reasonable degree of certainty or reasonable degree of certainty within the particular knowledge of their own professional experience." The testimony of each of these four wit-

nesses was stricken in its entirety and the jury was instructed to disregard their testimony.

Additionally, the following interrogatories were submitted to the jury, over the objection of appellant's counsel:

"(A) Do you find by a preponderance of the evidence that Michael Coe was under the influence of alcohol at the time of the accident on July 23, 1993?

"(B) Do you find by a preponderance of the evidence that Michael Coe saw or should have seen the flashlight being waved by William A. Young prior to the accident of July 23, 1993?

"(C) Do you find by a preponderance of the evidence that Michael Coe saw or should have seen the SMV (slow-moving vehicle) signs located on the tractor and trailer prior to the accident of July 23, 1993?"

On March 6, 2000, the jury returned a verdict in favor of appellee, and the trial court issued judgment in favor of appellee. From this judgment, appellant raises the following assignments of error:

"[1.] The trial court committed reversible error when it excluded the testimony of four expert witnesses on the basis of competency where there was no objection to their testimony, they had testified one week earlier, and a majority of their testimony was from direct personal knowledge.

"[2.] The trial court committed reversible error when it ignored the mandates of R.C. 2315.19 and permitted interrogatories to be submitted which clearly went to non-determinative issues."

■ The competency of an expert witness is within the discretion of the trial court and a court's ruling thereon will not be reversed absent a clear showing of an abuse of discretion. *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 157, 10 O.O.3d 332, 333, 383 N.E.2d 564, 565–566. "An abuse of discretion requires more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *State v. Reiner* (2000), 89 Ohio St.3d 342, 356, 731 N.E.2d 662, 676.

For the reasons set forth below, we conclude that the trial court's decision to strike the entire testimony of Dr. David Schneider ("Schneider") constituted reversible error. Since this case must be reversed and remanded on this basis, we decline to address the reliability of the testimony of Henry Lipian ("Lipian"), regarding accident reconstruction, Caroline Wolfe ("Wolfe"), as to damages, and Dr. Eckel ("Eckel"), also regarding damages.

While we might find that the trial court's decision to strike the entire testimony of four of the plaintiff-appellant's expert witnesses, approximately a week after they testified in court, after the close of both parties' case-in-chief, and without

prior objection by the defendant-appellant, was, in fact, unreasonable, arbitrary, or unconscionable, under the facts presented in the instant case we do not need to determine the issue of the timeliness of the trial court's decision. Instead, upon review of the record we conclude that Schneider's testimony was reliable and that the court abused its discretion in striking all of his testimony. Additionally, under the facts of this case, it is questionable whether the court's decision was based on the merits of the objection and not on the conduct demonstrated by appellant's counsel, which was not significantly prejudicial in this case.

In determining whether the testimony of an expert witness was proper, we must consider Evid.R. 702, which governs the admission of expert testimony. Evid.R. 702 provides:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information, To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

"(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

"(2) The design of the procedure, test, or experiment reliably implements the theory;

"(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

In the case *sub judice*, there is no dispute that Lipian, Schneider, Wolfe, and Eckel are qualified experts who testified about subjects beyond the knowledge of lay persons. Evid.R. 702(A) and (B). Thus, our inquiry is whether the testimony complied with Evid.R. 702(C), *i.e.*, the reliability of the testimony.

█ In *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 687 N.E.2d 735, the Supreme Court of Ohio designated the following four factors, adopted from *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 593–594, 113 S.Ct. 2786, 2796–2797, 125 L.Ed.2d 469, 482–484, to be considered in evaluating the reliability of scientific evidence: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a

known or potential rate of error, and (4) whether the methodology has gained general acceptance. *Miller* at 611, 687 N.E.2d at 739–740, citing *Daubert* at 593–594, 113 S.Ct. at 2796–2797, 125 L.Ed.2d at 482–484. Both the United States Supreme Court in *Daubert* and the Supreme Court of Ohio in *Miller* emphasized that none of the factors is determinative: "the focus is 'solely on principles and methodology, not on the conclusions that they generate." *Miller* at 611–612, 687 N.E.2d at 740, citing *Daubert* at 595, 113 S.Ct. at 2797–2798, 125 L.Ed.2d at 484. Thus, there is no requirement that an expert utter any "magic language," *i.e.,* that his opinion was within the reasonable degree of certainty or reasonable degree of certainty within the particular knowledge of his professional experience.

In *State v. Nemeth* (1998), 82 Ohio St.3d 202, 211, 694 N.E.2d 1332, 1339, the Supreme Court of Ohio explained that "[r]elevant evidence based on valid principles will satisfy the threshold reliability standard for the admission of expert testimony." *Id.* "The credibility to be afforded these principles and the expert's conclusions remain a matter for the trier of fact." *Id.* Thus, the reliability requirement under Evid.R. 702 "is a threshold determination that should focus on a particular type of scientific evidence, not the truth or falsity of an alleged scientific fact or truth." *Id.*

Doctor Schneider, an Associate Professor of Pharmacology at Wayne State University, Detroit, Michigan, was called by appellant to testify regarding blood-alcohol concentrations. Schneider testified that he obtained a patent on a device that can measure alcohol based on saliva, instead of breath or blood. While conducting tests and gathering data to obtain the patent, he conducted two tests of three hundred forty-one people comparing the level of alcohol in blood and saliva.

Schneider explained that blood is composed of two parts: cells that are essentially fat, and water that is the serum or plasma. He stated that there is a difference in serum B.A.C. versus whole blood B.A.C. because alcohol is water soluble, not fat soluble, which allows the alcohol to go to the water in the blood, not the fat. Thus, serum B.A.C. is always higher than the whole blood B.A.C. because the cellular elements have been removed, leaving less volume. Schneider opined that, in his ten or twelve years of clinical laboratory work experience, a serum B.A.C. is "about 35 percent too high most of the time." Schneider stated that his opinion was based "on [his] expertise and scientific opinion and * * * reading of literature and * * * actually carrying out some of these experiments."

Schneider testified that publications indicate that serum B.A.C. can be from twelve to fifty-nine percent too high, depending on the person taking the measurement and the criteria they are looking for. Schneider acknowledged that Dr. Staubus, defendant-appellee's expert, stated in his report that an accurate

reading of appellant's B.A.C. is .068. However, Schneider opined that a more accurate B.A.C. would be "no more than .05, .052, somewhere in there and could be as low as .035 or so." Appellant's serum B.A.C. was measured at .08.

Schneider explained that certain variables can influence a B.A.C. measurement. By way of example, he explained that an "athlete" has more red blood cells than a "couch potato"; thus, if both drank the same quantity of alcohol, the "athlete" would be more drunk, if you measure the serum, as compared to the "couch potato" because the alcohol goes to the water. Additionally, Schneider testified that the test result could vary due to fluctuations in alcohol because of physiological demands, the reliability of the instrument, the reliability of the operator, and how fresh the testing kit was.

Turning to the factors enumerated in *Miller*, the evidence presented reveals that testing to evaluate the differences in serum B.A.C. versus whole blood B.A.C. has been done and that such testing has been subject to peer review. While the testing reveals that a definite difference exists between serum B.A.C. and whole blood B.A.C., Schneider testified that there is a potential rate of error in determining the B.A.C. because of variables such as the person taking the test and the criteria measured.

This court has previously noted that general acceptance is no longer a prerequisite to the admissibility of expert testimony. *Furness v. Pois* (Dec. 22, 2000), Portage App. No. 99–P–0014, unreported, 2000 WL 1876655, at *16. However, "more than one doctor must find the idea to be beyond a hypothetical possibility before it would be considered admissible in a court of law." *Id.* In the instant case, appellee's expert witness, Dr. Alfred E. Staubus, also opined that appellant's B.A.C. was too high; in his opinion, appellant's serum B.A.C. was eighteen percent too high. Additionally, both Dr. Schneider and Dr. Staubus testified that publications acknowledge that serum B.A.C. is higher than whole blood B.A.C. Both doctors also testified that they each have observed cases demonstrating a reliable ratio of serum B.A.C. versus whole blood B.A.C; the doctors do not, however, agree as to the ratio. Thus, the record demonstrates that Dr. Schneider, Dr. Staubus, and experts who have published in the field, have found the idea that B.A.C. differs from serum as compared to whole blood "to be beyond a hypothetical possibility."

Thus, we conclude that the principles and methods employed by Schneider in reaching his opinion were reliable, his opinion certainly was relevant, and it would have assisted the jury in understanding the evidence relating to B.A.C. measurements. "Furthermore, the reliability requirement of *Daubert* should not be used to exclude * * * such evidence simply because the evidence is confusing." *Miller* at 614, 687 N.E.2d at 741. Thus, the court's decision to strike Schneider's

testimony, in its entirety, constituted an abuse of discretion in the instant case. Appellant's first assignment of error has merit.

Civ.R. 49(B) provides that the court shall submit written interrogatories to the jury, together with a general verdict form. Civ.R. 49(B) further provides that interrogatories may be directed to determinative issues of fact or mixed questions of fact and law. See *Goldberg v. Bd. of Trustees of Lake Hosp. Sys., Inc.* (July 21, 2000), Lake App. No. 99–L–010, unreported. The three interrogatories at issue in the instant case are directed to factual issues presented. Additionally, the judge instructed the jury as to the purpose of the interrogatories with the following instruction:

"I want to emphasize these are factual determinations for you to make and those questions, in and of themselves, do not relate to the questions of negligence. In the process of all of this, you're going to have to find all of the facts and determine whether or not those facts convince you by a preponderance of the evidence of negligence on the part of either the defendant or the plaintiff, but my only point is, those are simply factual determinations which you have been asked to make separately as part of your findings in this case."

Further, both Civ.R. 49(B) and case law permit interrogatories directed to evidentiary facts. "The purpose of an interrogatory is to 'test the jury's thinking in resolving the ultimate issue so as to not conflict with its verdict.'" *Freeman v. Norfolk & W. Ry.* (1994), 69 Ohio St.3d 611, 613, 635 N.E.2d 310, 313. The Supreme Court of Ohio stated that "[a] properly drafted interrogatory will elicit a statement of facts from which a conclusion of negligence or no negligence may be drawn. An interrogatory that is merely probative or evidentiary in nature, and does not touch on an ultimate issue, is improper." (Citations omitted.) *Id.*

In the case *sub judice,* the interrogatories went directly to negligence and the issue of comparative negligence. Whether the appellant was under the influence of alcohol, saw appellee's flashlight, and/or saw the SMV signs on the tractor and trailer are evidentiary facts essential to the determination of comparative negligence. Appellant's second assignment of error is without merit.

Based on the forgoing analysis this case is reversed, and the cause is remanded for a new trial consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

FORD, P.J., concurs.

CHRISTLEY, J., concurs separately.

CHRISTLEY, Judge, concurring.

I respectfully concur in judgment only as I part company with the majority as to the rationale employed in its reversal of the first assignment of error concerning the admissibility of testimony provided by appellant's four expert witnesses. Nevertheless, as will be addressed later, I concur in the reversal because appellee's objection to the expert witnesses was untimely and, therefore, waived.

I will first address the majority's determination that it was error for the trial court to exclude Dr. David Schneider's testimony. In *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 687 N.E.2d 735, the Supreme Court of Ohio set forth the following factors to be considered in evaluating the reliability of scientific evidence: "(1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." *Miller* at 611, 687 N.E.2d at 740, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 593–594, 113 S.Ct. 2786, 2796–2797, 125 L.Ed.2d 469, 482–484.

Similarly, Evid.R. 702, as amended in 1994, sets out the requirements for the admission of expert testimony:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

"(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

"(2) The design of the procedure, test, or experiment reliably implements the theory;

"(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

In general terms, Dr. Schneider stated that, in his opinion, the reading of appellant's serum blood-alcohol concentration ("B.A.C.") of .08 milligrams per

deciliter was thirty-five percent too high because of the type of test employed. According to him, appellant's actual B.A.C. was "no more than point 05, point 052, somewhere in there and could be as low as point 035 or so." Dr. Schneider based his opinion on "[his] expertise and * * * scientific opinion[,] * * * reading of the literature and * * * carrying out some of these experiments."

When determining whether Dr. Schneider's testimony met the requirements set forth in *Miller*, it is evident from the record that there was *no testimony or other evidence* that his theory of a thirty-five-percent differential had been subjected to peer review or had gained general acceptance in the scientific community. *Only* Dr. Schneider opined that the reading of the serum B.A.C. was thirty-five percent too high based on his clinical experience.[1] Further, Dr. Schneider never mentioned that his theory had been subjected to peer review or that his methodology and test procedures had gained general acceptance.

Although peer review and general acceptance factors are not determinative prerequisites to admissibility under *Miller*, they are nonetheless "factors for a court to consider in determining reliability." *Miller* at 613, 687 N.E.2d at 741. As this court noted in *Furness v. Pois* (Dec. 22, 2000), Portage App. No. 99–P–0014, unreported, 2000 WL 1876655, at * 5:

"[W]hile general acceptance is not a prerequisite to admissibility as it once was * * *, *surely more than one doctor must find the idea to be beyond a hypothetical possibility before it could be considered admissible in a court of law.*" (Emphasis added.)

Dr. Schneider *never* claimed that others in the scientific community accepted his theory that the degree of variation between serum and whole blood B.A.C. was thirty-five percent. Rather, he merely stated that his opinion was based on his *own* expertise.

The majority cites appellee's expert witness, Dr. Alfred E. Staubus, as corroborating Dr. Schneider's opinion. According to Dr. Staubus, appellant's serum B.A.C. was only eighteen percent too high. However, just as with Dr. Schneider, Dr. Staubus' theory of an eighteen percent differential was *never* subjected to peer review or proven to have gained general acceptance in the scientific community. Rather, Dr. Staubus merely based his opinion on his *own* knowledge and certain unidentified medical literature.[2] Likewise, Dr. Staubus never claimed

---

1. Dr. Schneider also attempted to support his opinion by relying on certain unidentified medical publications. However, according to Dr. Schneider, these publications indicated that serum B.A.C. can range between *twelve to fifty-nine percent too high.*

2. Unlike Dr. Schneider, Dr. Staubus did not conduct clinical experiments to substantiate his theory.

that others in the scientific community accepted his theory. In fact, Dr. Staubus stated that not all scientists use an eighteen-percent differential.[3]

Moreover, contrary to the requirements of Evid.R. 702(C), Dr. Schneider did not discuss the circumstances surrounding his experiments. In fact, he did not discuss the experiments at all. Accordingly, barring other considerations, there was nothing unreasonable, arbitrary, or unconscionable with the trial court's decision to exclude his testimony.

With respect to Henry Lipian ("Lipian"), the accident reconstruction expert, his opinion as to who was the proximate cause of the accident was not properly qualified. Not only did Lipian fail to express his opinion in terms of probability, but the issue of who caused the accident was, arguably, one in which the jury was capable of determining without his testimony.

Although appellant cites *McQueen v. Goldey* (1984), 20 Ohio App.3d 41, 20 OBR 44, 484 N.E.2d 712, to support the admission of Lipian's testimony, I note that there were two "experts" who reconstructed the accident: (1) the police officer who investigated the accident and (2) the accident reconstruction expert.

While the trial court in *McQueen* allowed the police officer to testify, the court excluded the testimony of the accident reconstruction expert. The measurements, speed estimates, and physical characteristics of the crash were already of record before the *McQueen* jury. As cited by the instant appellant, the court in *McQueen* found that "[t]he officer's opinion was based upon knowledge not possessed by the ordinary juror. He only testified regarding two matters and did not reconstruct an elaborate accident scenario as did appellants' expert witness." *Id.* at 49, 20 OBR at 51, 484 N.E.2d at 721.

In ruling on the issue of the exclusion of the accident reconstruction expert, the *McQueen* court made the following determination:

"The ultimate questions before the jury were who caused the accident and the percentage of fault of each party. These questions were not of a highly technical nature nor beyond the comprehension of the average juror. The members of the

---

**3.** The following exchange took place on cross-examination of Dr. Staubus:

"A. Again, as I said, the range—the acceptable range is somewheres [*sic*] in the neighborhood of 16 to 18 percent.

"Q. Well, that's your acceptable range, but some other expert might have some other acceptable range; would you agree with that?

"A. Well, you can find experts that will agree with almost anything.

"* * *

"Q. * * * But the point is, not all scientists agree on that ratio; do they?

"A. They may or may not.

"* * *

"A. This is the ratio I use for my calculations. What other individuals may or may not use, you'd have to ask them."

jury had all the necessary facts before them from which they could ascertain the cause and fault. The expert witness was no more qualified than the average layman to determine whether appellee was paying proper attention or going too fast under the circumstances, or whether McQueen was paying proper attention or misjudged the speed and location of the automobile.

"We hold that the cause of the accident in the case at bar, be it the speed or inattention of appellee or the inattention or bad judgment of McQueen, was a subject within the experience, knowledge and comprehension of the jury. The expert witness' testimony regarding cause and the percentage of each party's fault would not 'serve to enlighten the jury with respect to a matter outside its competence but rather * * * [would be] a clear invasion of the jury's province on the precise ultimate fact[s] in issue.'" (Citation omitted.) *McQueen* at 47–48, 20 OBR at 50, 484 N.E.2d at 719–720; see, also *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881, paragraph three of the syllabus; *Wallace v. Auer* (Apr. 20, 1994), Hamilton App. No. C–930071, unreported, 1994 WL 158913, at *4.

Accordingly, "[w]hen the proffered opinion will answer the very question that ultimately must be determined by the factfinder, and the factfinder is capable of reaching a correct conclusion without that opinion, the trial court does not abuse its discretion by refusing to allow the testimony." *Wallace* at * 4.

In applying the foregoing to the instant matter, the record shows that prior to Lipian's testifying, the investigatory officers, Trooper Nathan H. Dutton ("Trooper Dutton") and Lieutenant George C. Williams ("Lieutenant Williams"), testified on behalf of appellant. Essentially, both of the officers explained that (1) a slow-moving vehicle emblem was on appellee's trailer and tractor; (2) appellee used a flashlight to signal other drivers of his presence on the road; (3) no lights were on the trailer; (4) the tractor had one white light; and (5) appellant's motorcycle collided with appellee's tractor.

Further, during cross-examination of Trooper Dutton, a crash report, which was prepared by him, was admitted into evidence as appellee's exhibit C. This report diagramed the crash scene, the skid marks, the point of impact, and recorded the distance to various objects at the crash scene.

In light of Trooper Dutton's and Lieutenant Williams's testimony, the jury had all the information necessary to properly resolve the ultimate issue in this case, to wit, causation. Thus, Lipian's expert testimony was not necessary to aid the jury's understanding of this issue, as the jury was capable of making its decision without his testimony.

Certainly, that is not to say that there are occasions when an expert witness can opine on the ultimate issue that must be determined by the jury. However, to do so, not only must the expert be qualified per Evid.R. 702, but his/her

proposed testimony must be aimed at facts or knowledge that are outside the realm of the common experience of the jury. *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d 77, 81–82, 40 O.O.2d 87, 89–91, 228 N.E.2d 304, 307–308. See, also, *Shepherd v. Midland Mut. Life Ins. Co.* (1949), 152 Ohio St. 6, 39 O.O. 352, 87 N.E.2d 156, paragraph two of the syllabus. "While testimony on an ultimate issue to be decided by the trier of fact is not *per se* inadmissible in Ohio, it is within the sound discretion of a trial court to refuse to admit the testimony of an expert witness on an ultimate issue where such testimony is not essential to the jury's understanding of the issue and the jury is capable of coming to a correct conclusion without it." (Emphasis in the original.) *Bostic* at paragraph three of the syllabus.

Finally, any opinion offered by Lipian regarding the cause of the accident had to be expressed in terms of the probability or actuality of the causal relationship. *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, paragraph one of the syllabus; *Shepherd* at paragraph two of the syllabus. "In Ohio, the admissibility of expert testimony that an event is the proximate cause is contingent upon the expression of an opinion by the expert with respect to the causative event in terms of probability." *Stinson* at 455, 633 N.E.2d at 536. While the language used need not be the precise "magic" words, it must be specific enough to convey the same meaning. *Martin v. Cincinnati St. Ry. Co.* (1938), 61 Ohio App. 375, 380–381, 15 O.O. 257, 259–260, 22 N.E.2d 735, 737–738. That degree of probability, however, was *never* asked of Lipian; thus, the trial court properly excluded his testimony.

Insofar as the testimony of Caroline Wolfe ("Wolfe") and Dr. Norman Eckel ("Dr. Eckel") is concerned, any error in excluding their testimony was harmless. A review of the testimony shows that Wolfe proffered an opinion as to whether the physical impairments sustained by appellant in the accident would disable him from participating in the work force. In turn, Dr. Eckel's testimony focused on appellant's total economic loss as a result of the accident. Accordingly, both Wolfe and Dr. Eckel respectively testified to the damage sustained by appellant in this case. But given that the jury never had the opportunity to consider the issue of damages, as the verdict was returned in favor of appellee, the exclusion of Wolfe's and Dr. Eckel's testimony amounted to harmless error.

However, upon further examination of Dr. Eckel's testimony, it is evident that appellant failed to establish a foundation for his opinion as required by Evid.R. 702 with respect to the reliability or reasonable certainty of his damage computation. Recovery for future damages must be shown with reasonable certainty and/or reasonable probability. *Ryne v. Garvey* (1993), 87 Ohio App.3d 145, 155–156, 621 N.E.2d 1320, 1326–1327; *Powell v. Montgomery* (1971), 27 Ohio App.2d 112, 116–123, 56 O.O.2d 279, 282–286, 272 N.E.2d 906, 909–914; *Keedy v.*

*Lollathin* (Dec. 26, 1995), Belmont App. No. 93–B–41, unreported, 1995 WL 763311, at * 5; *Hohn v. Ohio Dept. of Mental Retardation & Developmental Disabilities* (Dec. 14, 1993), Franklin App. No. 93AP–106, unreported, 1993 WL 524857, at * 4; *Bentley v. Smallwood* (June 25, 1993), Vinton App. No. 471, unreported, 1993 WL 393645, at * 9–10. Because Dr. Eckel's opinion was not expressed in such terms, his testimony was properly excluded.

Regardless of the preceding discussion, I am in agreement that the trial court erred in excluding the testimony of appellant's four expert witnesses but for reasons other than those employed by the majority. Essentially, I am of the opinion that appellee waived his objection to the testimony of the expert witnesses, as he did not object to their testimony with reasonable promptness.

The majority briefly points out that it *might* find that the trial court's decision to strike the testimony of appellant's expert witnesses upon a motion made by appellee approximately one week after the experts testified and at the close of all the evidence was unreasonable, arbitrary, or unconscionable. While the majority does not further examine this issue, I will take this opportunity to explore the implications of appellee's failure to object with reasonable promptness to the admissibility of the expert witnesses' testimony.

Although appellee suggests in his appellate brief that to wait until the close of all the evidence to make a motion to strike "is of no legal import[,]" appellee seemingly ignores the legal principle advanced in Evid.R. 103.

Evid.R. 103(A)(1) requires that a party timely object when allegedly inadmissible evidence is introduced at trial.[4] "Failure to make a timely objection or motion to strike is a waiver of the objection." *State v. Thomas* (Apr. 17, 1990), Highland App. No. 719, unreported, 1990 WL 54913, at * 3, citing *State v. Stearns* (1982), 7 Ohio App.3d 11, 7 OBR 12, 454 N.E.2d 139. See, also, *Amie v. Gen. Motors Corp.* (1980), 69 Ohio App.2d 11, 14, 23 O.O.3d 15, 17–18, 429 N.E.2d 1079, 1082; *State v. McDonald* (1970), 25 Ohio App.2d 6, 11, 54 O.O.2d 6, 8–9, 265 N.E.2d 793, 796; *Gates v. Dills* (1967), 13 Ohio App.2d 163, 164–165, 42 O.O.2d 292, 293–294, 234 N.E.2d 604, 605–606; *State v. Allen* (Sept. 9, 1993), Cuyahoga App. No. 62275, unreported, 1993 WL 366976, at * 13; Evid.R. 103(A). Stated differently, "[a] party waives his objection to the introduction of testimony unless the objection is made with reasonable promptness." *Thomas* at * 3, citing *Amie.*

---

4. Evid.R. 103(A) provides:
    "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
    "(1) Objection. In case the ruling is one admitting evidence, a *timely objection or motion to strike* appears of record stating the specific ground of objection, if the specific ground was not apparent from the context[.] * * * " (Emphasis added.)

Generally speaking, there is considerable consistency among Ohio appellate courts that there must be an element of timeliness which reasonably relates to the earliest opportunity for making an objection. Those cases generally present two analogous situations.

First, there are cases in which there is notice to the opposing party that an expert witness will be testifying and/or there is knowledge as to the subject matter to which the expert witness will be testifying. The rulings have been consistent that objections relating thereto must be evaluated in light of that notice and knowledge.[5] *Nickey v. Brown* (1982), 7 Ohio App.3d 32, 35–36, 7 OBR 34, 37–39, 454 N.E.2d 177, 181–183.

In other words, if trial counsel is aware, either formally or informally, that the opposing party intends to introduce certain testimony, then counsel's dilatory objections will not be honored. *Sommer v. Conrad* (1999), 134 Ohio App.3d 291, 298, 730 N.E.2d 1058, 1063. For instance, where an expert witness testifies at trial by videotaped deposition and objections were made during the deposition but not relayed to the trial court in a timely fashion, the objections are deemed waived. *Sommer* at 298, 730 N.E.2d at 1063; see, also, *Zachariah v. Rockwell Internatl.* (1998), 127 Ohio App.3d 298, 304, 712 N.E.2d 811, 814–815; *Rivera v. Lake Terminal RR. Co.* (1999), 132 Ohio App.3d 483, 489–491, 725 N.E.2d 676, 680–682; *Allen* at * 13.

Second, in cases where cross-examination has been engaged in prior to an objection to the direct testimony, the rulings have been consistent that the objection has been waived. See, *e.g., Amie* at 12–13, 23 O.O.3d at 16–17, 429 N.E.2d at 1081–1082; *Gates* at 163–165, 42 O.O.2d at 292–294, 234 N.E.2d at 605–606; *Thomas* at * 3.

In applying the foregoing to the instant matter, appellee waived his objection to the testimony of appellant's four expert witnesses. Instead of immediately objecting to the expert testimony at the time it was offered or admitted, appellee opted to cross-examine the expert witnesses, present his defense, and then wait approximately one week before presenting his motion to strike. While appellant was apparently so flummoxed that he did not request a continuance or other relief to remedy this blind-side attack, the trial court, nevertheless, should not have granted appellee's motion to strike. There is no question that appellant was severely prejudiced by the delay, as it effectively prevented him from rehabilitating his witnesses.

---

5. In the instant case, the record before this court fails to reflect whether depositions were taken of the four expert witnesses as issue. Absent from the record are the issuance of subpoenas and the resulting depositions, if any. Hence, it is unclear whether depositions were conducted in this case and whether any pretrial objections could have been made.

In summation, under the circumstances presented in this case, I would hold that in this instance, where the party fails to object to the testimony offered by an expert witness, engages in cross-examination, and proceeds at length with the remainder of trial, this party has waived any objection to such testimony.[6]

Based on the foregoing reasons, I concur in judgment only with the opinion of the majority.

---

6. Certainly, there could be an extreme situation to the contrary, but, it would require that the trial court take whatever measures necessary to ensure that opposing counsel is not prejudiced due to the delayed objection.