OPINION
{¶ 1} The defendant-appellant, Ricardo Duque, appeals the judgment and sentence of the Seneca County Court of Common Pleas finding him guilty of one count of rape in violation of R.C.2907.02(A)(1)(b).
 {¶ 2} On November 28, 2003, Duque was at home with his twelve year old daughter, Erica, and his girlfriend's eight year old daughter, T.H. On that day, T.H. alleged that sometime between 5 p.m. and 8 p.m., Duque came into the room where she was watching television, pulled down his pants and her pants, inserted his penis into her vagina and had sexual intercourse with her. After the event, T.H. stated that Duque ejaculated into a blue cloth that he was holding. During the event, Erica was in another room playing on the computer.
 {¶ 3} The next morning, on November 29, 2003, T.H. alleged that Duque entered the recreation room, picked T.H. up and carried over to a bar stool. Again, T.H. alleged that Duque had sexual intercourse with her, and, when he was finished, he ejaculated into a blue cloth.
 {¶ 4} That same evening, T.H. told her mother what Duque did to her that previous night and that morning. T.H's mother then took T.H. to St. Vincent's Hospital in Toledo for a sexual assault examination. Monique Ford, a nurse at the hospital, performed two tests to discover any possible injuries. The test results were consistent with sexual assault. Specifically, the test revealed that there were injuries to T.H's labium and vagina. Moreover, T.H's hymen was broken.
 {¶ 5} A grand jury indicted Duque on two counts of rape in violation of R.C. 2907.02(A)(1)(b) with a specification because the victim was under the age of ten. A jury was convened on November 15, 2004. Subsequently, the jury found Duque guilty of rape for the November 28, 2003 incident, but acquitted him on the November 29, 2003 incident.
 {¶ 6} Duque appeals alleging six assignments of error. For the sake of judicial economy, the first, second, and third assignments of error will be discussed together. Similarly, the fourth and sixth assignments of error will be consolidated.
 First, Second, and Third Assignments of Error THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
 THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT PERMITTED THEST. VINCENT'S NURSE TO TESTIFY AS AN EXPERT WITNESS
 THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT PERMITTED THEST. VINCENT'S NURSE TO TESTIFY AS TO MEDICAL EVIDENCE WHICHQUESTIONS HAD NOT BEEN PRESENTED IN THE PROPER FORM BY THESTATE.
 {¶ 7} In these assignments of error, Duque generally argues that his trial counsel's failure to object to Ford as an expert witness amounted to ineffective assistance of counsel. Specifically, Duque contends that Ford's alleged testimony was "expert" in nature and her qualifications and background failed to meet the standards necessary for an expert witness. Duque also suggests that the State failed to lay a proper foundation to establish reliability for both techniques that Ford performed when she examined T.H. for sexual assault. Furthermore, Duque argues that his trial counsel's failure to object to Ford's testimony because she did not use the "magic words" necessary for an expert witness — e.g. "within a reasonable degree of medical certainty" — also amounted to ineffective assistance of counsel.
 {¶ 8} Contrarily, the State contends that Ford was not an expert witness and, therefore, was not subject to the expert witness standards and requirements enumerated by the United States Supreme Court, the Ohio Supreme Court or the Ohio Rules of Evidence. In the alternative, the State argues that if Ford's testimony is beyond that of lay person testimony, her education and experience as well as the techniques that she performed satisfies the expert witness requirements.
 {¶ 9} It is well established that Ohio has adopted the two prong test established in Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, to determine whether counsel was effective. See, e.g., State v. McKinney, 3rd Dist. No. 4-04-12,2004-Ohio-5518, at ¶ 60. In order to prove that counsel was ineffective, a defendant must first show "that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-688. Second, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.
 {¶ 10} In order to have plain error under Crim.R. 52(B), there must be a deviation from a legal rule, the error must be an "obvious" defect in the trial proceeding, and the error must have affected a defendant's "substantial rights." State v. Barnes,94 Ohio St.3d 21, 27, 2002-Ohio-68. Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id.
 {¶ 11} Different rules of evidence apply depending on whether Ford's testimony was "expert" in nature or that of a layperson. See Evid.R. 701 and 702. For example, Evid.R. 701, Opinion Testimony by Lay Witness, states:
If the witness is not testifying as an expert, his testimonyin the form of opinions or inferences is limited to thoseopinions or inferences which are (1) rationally based on theperception of the witness and (2) helpful to a clearunderstanding of his testimony or the determination of a fact inissue.
On the other hand, Evid.R. 702, Testimony by Experts, governs the admissibility of expert testimony. It states:
A witness may testify as an expert if all of the followingapply: (A) The witness' testimony either relates to mattersbeyond the knowledge or experience possessed by lay persons ordispels a misconception common among laypersons;
 (B) The witness is qualified as an expert by specializationknowledge, experience, training, or education regarding thesubject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific,technical, or other specialized information. To the extent thatthe testimony reports the result of a procedure, test, orexperiment, the testimony is reliable only if all of thefollowing apply:
 (1) The theory upon which the procedure, test, or experimentis based is objectively verifiable or is validly derived fromwidely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliablyimplements the theory;
 (3) The particular procedure, test, or experiment wasconducted in a way that will yield an accurate result.
Evid.R. 702.
 {¶ 12} To determine reliability, the Ohio Supreme Court, following the United States Supreme Court reasoning in Daubertv. Merrell Dow Pharmaceuticals (1993), 509 U.S. 579, 589,113 S.Ct. 2786, noted that "a court must assess whether the reasoning or methodology underlying the testimony is scientifically valid."Miller v. Bike Athletic Co. (1998), 80 Ohio St.3d 607, 611,687 N.E.2d 735. Both the Ohio Supreme Court in Miller and the United States Supreme Court in Daubert determined that "the focus is `solely on principles and methodology, not on the conclusions that they generate.'" Id. at 611-12 citing Daubert,509 U.S. at 595. The Eleventh District Court of Appeals elaborated this and stated:
Thus, there is no requirement that an expert utter any "magiclanguage," i.e., that his opinion was within the reasonabledegree of certainty or reasonable degrees of certainty within theparticular knowledge of his professional experience.
 Coe v. Young (2001), 145 Ohio App.3d 499, 504,763 N.E.2d 652.
 {¶ 13} In the instant case, Ford, T.H's treating sexual assault nurse, testified:
Q * * * In what capacity are you employed at St. Vincent's?
 A I — I am a full-time registered nurse and I'm also a sexualassault nurse.
 Q How long have you worked as a registered nurse at St.Vincent's?
 A At St. Vincent's, I've been a nurse, uhm, for like, maybe ayear and a half now. I've been a sexual assault nurse for threeyears, now.
 Q Do you have any other nursing employment as part of yourprofession?
 A Yes. Uhm, I'm a sexual assault nurse. I'm a trauma nurse,uhm — uhm, ASCS qualified, that's for, uhm, full arrest andthings like that, those qualifications.
* * *
Q So, how many years total?
 A Roughly, about 10 years I've been a nurse.
 Q Okay. And, what education and training did you have toqualify to be a registered nurse?
 A I, uhm, for my licensed practical nurse, LPN degree, I wentand, uhm, received a diploma from Toledo School of PracticalNursing. And, uhm, for my associates degree that I have fornursing, I went to a school called Owens Community College. And,for the special training, those are individual training sessionsthat we did that took, you know, some — two days, the sameprogram, the sexual assault program was a 72 hour course.
 Q So, you took some specialized training to be a sexualassault nurse examiner, is that correct?
 A Yes, I did.
 Q Could you tell us a little more detail what that trainingwas?
 A Okay. The certification for a sexual assault nurse is 72hours training, which, uhm, includes, uhm, we did book part,which taught us about documentation, the anatomy and physiologydocumentation, anatomy, physiology. And, uhm, also, uhm, we hadto do clinicals to teach us how to do the things we need to dofor the exam. And we also had to learn the legal part of it,testifying, more documentation, the legal do's and don'ts.
 Q As a result of receiving that training did you becomecertified as what's called a S.A.N.E. nurse?
 A Yes.
 Q And, what's that certification?
 A Well, it's the certification to, uhm, be able to do thesexual assault kits per the Ohio Department of Health protocol.
 Q Okay. How many exams have you done as part of your duties asa S.A.N.E. nurse?
 A Roughly, in my three years, about a hundred.
Trial Tr. pp. 490-92
 {¶ 14} Ford then proceeded to testify about T.H's sexual assault examination. The record states:
A * * * We, uhm, I looked down into the vaginal area andrectal area to see if there's any injuries or any specimens thatwe could obtain.
 Q How is that determined, whether or not there's anyinjuries?
 A Well, a couple of techniques that we use. One of thetechniques I used, uhm, was a Foley technique. A Foley techniqueis a catheter, which at the end of the catheter we can insertabout maybe six inches inside, uhm, inflate the ball. It's a ballwith water and kind of pulls back and that would let us visualizethe hymen.
 A hymen is a piece of tissue down in the vaginal area inwhich, uhm, a person would have, a pre-pubescent patient couldhave, uhm, that's not sexually active. I do not visualize onewith her and that could be corroborated with the story ofrepeated abuse, in which she said.
 Another test, or technique that I did was, uhm, we use, it'scalled Toluidine blue, in which it adheres to, uhm, pre-nucleatedcells which let's us see fresh abrasions. So, when you put theToluidine blue on and wipe it off, it would adhere. The bluenesswould adhere to the damage tissue and, therefore, uhm, those werevery visual. They are — that collaborates with the story of abusethat took place the other day, or the day before when she thisall happened prior to them coming to the hospital.
Id. at 501-02. Ford then explained some photos of T.H's vagina, which showed abrasions and the absence of a hymen.
 {¶ 15} Based on the two techniques that Ford performed, we conclude that her testimony was not "expert" in nature. We base our conclusion on the fact that Ford's testimony regarding the Foley technique and the use of Toluidine blue amounted toobservations of the vaginal area, i.e. the absence of a hymen and the recognition of abrasions, which do not necessarily relate to matters beyond the knowledge or experience possessed by lay persons. For example, Ford did not testify about the results of the Foley technique. On the contrary, she testified that she used a large balloon to inflate the vagina to observe whether the hymen was still intact. The same results are reached with the Toluidine blue technique — i.e. Ford did not discuss the effects of Toluidine blue; rather she discussed whether there were abrasions to T.H.'s vagina that would be consistent with sexual abuse.
 {¶ 16} Assuming, arguendo, that Ford's testimony was "expert" in nature, however, we still conclude that the rules enumerated in Evid.R. 702 were satisfied. First, we note, arguendo, that the absence of a hymen and the ability to detect vaginal abrasions are matters beyond the knowledge or experience possessed by lay persons. Evid.R. 702(A). Second, we highlight Ford's experience and education as a sexual assault nurse, which included, among other things, specialized training as well as over 100 sexual abuse examinations. Evid.R. 702(B). Finally, we note that with the use of the Foley technique and Toluidine blue assisted Fordto observe whether T.H's hymen was still intact. Based on her experience as a sexual assault nurse, it is reasonable to rely on her knowledge, expertise, and training to perform simple techniques to visually examine a sexual assault victim to determine whether the victim's hymen is still present or whether there are vaginal abrasions. Evid.R. 702(C).
 {¶ 17} In sum, even assuming that Duque's trial counsel's performance was below an objective standard of reasonableness, we conclude, based on the aforementioned analysis that the result of the proceedings would not have been different because Ford's testimony was permissible. See Evid.R. 701; Evid.R. 702. Moreover, based on this same analysis, we cannot conclude that there was an "obvious" defect in the trial proceeding that affected Duque's "substantial rights." See, Barnes,94 Ohio St.3d at 27. Finally, following the Eleventh District's rationale in Coe, we conclude that it is not necessary for an expert to utter any "magic language;" therefore, Ford was not required to do so. Accordingly, the first, second, and third assignments of error are overruled.
 Fourth and Sixth Assignments of Error THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT'S MOTIONFOR ACQUITTAL AFTER THE VERDICT.
 THE VERDICT OF THE JURY IN THIS CASE IS AGAINST THE MANIFESTWEIGHT OF THE EVIDENCE AND MUST BE REVERSED.
 {¶ 18} Crim.R. 29 states that "a defendant . . . after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment . . . if the evidence is insufficient to sustain a conviction of such offense. . . ." In State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus, the Ohio Supreme Court set for the sufficiency of evidence standard as follows:
An appellate court's function when reviewing the sufficiencyof the evidence to support a criminal conviction is to examinethe evidence admitted at trial to determine whether suchevidence, if believed, would convince the average mind of thedefendant's guilt beyond a reasonable doubt. The relevant inquiryis whether, after viewing the evidence in a light most favorableto the prosecution, any rationale trier of fact could have foundthe essential elements of the crime proven beyond a reasonabledoubt.
 {¶ 19} In contrast, when reviewing whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, consider the credibility of the witnesses, and determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.
 {¶ 20} In the instant case, Duque argues that his acquittal coupled with his conviction amounts to insufficient evidence to sustain the conviction. Furthermore, Duque contends that the inconsistencies in T.H.'s testimony demonstrate that his conviction is against the manifest weight of the evidence.
 {¶ 21} A review of the record does indicate some inconsistencies in T.H.'s testimony. For example, the record highlights that initially the second rape occurred on a bar stool in a different room than the first rape; however, according to later testimony, the record indicates that T.H. changed her story and stated that both rapes took place on the couch in the living room. Another inconsistency in T.H's story was the time of day that the rapes occurred; however, T.H. testified that she was not keeping specific track of the time.
 {¶ 22} The record indicates that T.H. testified that Duque inserted his penis into her vagina on November 28, 2003 and November 29, 2003 and in both instances Duque ejaculated "white stuff" into a blue cloth. The record also contains the following testimony from Duque's daughter:
A I think she was there. I'm not sure. And, uhm, he told me,he was like, uhm, he goes, didn't you see [T.H.] use a brush? AndI was like, I said, yeah, because I — I don't know. I just said,yeah, and —
 Q What did you take that to mean when he was asking you?
 A If she used a brush down there.
 Q Down there. What are you talking about?
 A Uhm —
 Q Down between her legs, is that what you're trying to say?
 A Yeah.
 Q Okay. And, had you seen T.H. do something like that?
 A No.
 Q Okay. Do you know why your dad was asking you that?
 A Like, what do you mean by that?
 Q Did he say why he was asking you that?
 A Huh-uh. He just told me to —
 Q He told you to do what?
 A He told me to tell if people asked me that that's what Isaw.
 Q Okay. And, you'd never seen that before?
 A Nope.
 Q Okay. Did he say anything else as far as anything you shouldsay if people asked you about T.H.?
 A Oh! That, uhm, that she used her mom's dildo or somethinglike that.
 Q He told you to say what?
 A He — what —
 Q Can you just tell us what he told you to say?
 A I don't remember exactly what he told me to say.
 Q What it something about her mother's dildo, was she using itor something?
 A Yeah.
 Q Okay. And, had you ever seen T.H. do that?
 A Nope.
Trial Tr. at pp. 478-79.
 {¶ 23} Finally, it must be noted that Duque testified on his own behalf during the trial and on cross-examination stated:
Q You agree that a person engaged in sexual conduct with her,meaning vaginal intercourse with [T.H.]?
 A Yes.
 Q You heard the testimony from the — the nurse —
 A Yes
 Q — who did the sexual assault examination, right?
 A Yes
 Q And, Monique Ford told us that the physical trauma that shesuffered was consistent with sexual abuse, right?
 A Yes.
* * *
Q Okay. And, during these afternoon hours of November 28th,Friday, November 28th, 2003 when [T.H.] testified that she wasraped, you were the only male person at your house . . . weren'tyou?
 A Yes
 Q During the morning, Saturday, November 29th, 2003 when[T.H.] testified that sex and rape occurred, you were the onlymale person at your house . . . right?
 A Yes.
 Q So, therefore, during the times in which [T.H.] testifiedthat she was raped, you were the only male person at your housethat had the opportunity to commit these crimes consistent withthe sexual assault evidence as you heard, right?
 A Yes, but I didn't do it.
 Q Okay. That's your claim that you didn't do it, right?
 A Yes.
Id. at 644-45.
 {¶ 24} After reviewing the trial transcript and the evidence presented therein, we conclude that the trial court did not err in overruling Duque's motion for a Crim.R. 29 acquittal. Moreover, we conclude that the rape conviction is not against the manifest weight of the evidence. Specifically, keeping in mind T.H.'s age and experience, we emphasize T.H's description of the events that took place on November 28, 2003 and November 29, 2003 between her and Duque. We also highlight Duque's daughter's testimony, which stated that Duque told her to tell others that T.H. inserted a brush and a dildo in her vagina. Furthermore, we note Ford's testimony regarding T.H.'s hospital examination that indicated that her hymen was broken and her vagina contained abrasions consistent with sexual assault. Finally, we highlight Duque's testimony where he admitted that he was the only male in the house when the rapes occurred and agreed that someone did rape T.H. during the times alleged in the indictment.
 {¶ 25} In sum, based on the record before us, we conclude that after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of rape proven beyond a reasonable doubt. Furthermore, after reviewing the record, we cannot conclude that there is a manifest injustice in affirming Duque's rape conviction. Thus, Duque's fourth and sixth assignments of error are overruled.
 Fifth Assignment of Error THE CUMULATIVE EFFECT OF THE COURT'S OF THE PLAIN ERRORS [sic]OF THE TRIAL COURT IN ALLOWING THE ADMISSION OF EXPERT TESTIMONYFROM AND [sic] IMPROPERLY QUALIFIED WITNESSES, AND ADMITTINGTESTIMONY FROM THAT WITNESS ON MEDICAL EVIDENCE WITHOUT REQUIRINGTHE QUESTIONS AND RESPONSES BE TO THE PROPER REQUIRED STANDARD,AND THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN FAILING TORAISE OBJECTIONS TO THOSE ERRORS, DENIED THE DEFENDANT A FAIRTRIAL.
 {¶ 26} In this assignment of error, Duque alleges the doctrine of cumulative error. In State v. DeMarco (1987),31 Ohio St.3d 191, 509 N.E.2d 1256, paragraph two of the syllabus, the Ohio Supreme Court stated that a conviction will be reversed where the cumulative effect of the errors in a trial deprive a defendant of his constitutional right to a fair trial even though each instance of trial court error does not individually constitute cause for reversal. Since we find all of Duque's assignments of error without merit, we conclude that the cumulative effect of the errors do not warrant reversal. Therefore, this assignment of error is overruled.
Judgment affirmed.
 Cupp, P.J., and Rogers, J., concur.