[Cite as *In re S.T.*, 2020-Ohio-8.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## GREENE COUNTY

| | |
|---|---|
| IN THE MATTER OF: S.T., III | : |
| | : |
| | :     Appellate Case Nos. 2019-CA-23 and |
| | :     2019-CA-34 |
| | : |
| | :     Trial Court Case No. B48241 |
| | : |
| | :     (Appeal from Common Pleas Court- |
| | :     Juvenile Division) |
| | : |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 3rd day of January, 2020.

. . . . . . . . . . .

NATHANIEL R. LUKEN, Atty. Reg. No. 0087864, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, 55 Greene Street, First Floor, Xenia, Ohio 45385
     Attorney for Appellee, Greene County Children Services Board

SEAN BRINKMAN, Atty. Reg. No. 0088253, 10 West Monument Avenue, Dayton, Ohio 45402
     Attorney for Appellant, Mother

ROBERT ALAN BRENNER, Atty. Reg. 0067714, No. P.O. Box 340214, Beavercreek, Ohio 45434
     Attorney for Appellant, Father

. . . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** Appellants Father and Mother appeal from a judgment of the Greene County Court of Common Pleas, Juvenile Division, terminating their parental rights and granting permanent custody of their child, S.T., to Greene County Children Services ("GCCS"). Mother filed a timely notice of appeal with this Court on May 20, 2019. Father filed a timely notice of appeal with this Court on May 31, 2019.

**{¶ 2}** The record establishes that S.T. was born on June 6, 2009. Mother and Father never married, nor did they live together. Prior to his removal, S.T. had been in the sole physical custody of Mother since he was nine months old. Father had not seen S.T. since the child was nine months old and did not have a relationship with him.

**{¶ 3}** After a report of unsafe conditions at Mother's residence, which had been condemned, GCCS contacted the juvenile court on June 20, 2017, and requested emergency custody of S.T., which the magistrate granted.[1] On June 21, 2017, GCCS filed a complaint alleging that S.T. was abused, neglected, and dependent. After a shelter care hearing on the same day, the magistrate awarded GCCS interim custody of S.T., finding that reasonable efforts had been made by GCCS to prevent removal of the child from the home, to eliminate the continual removal from the home, and to make it possible for the child to return home.

**{¶ 4}** At an adjudication hearing on July 18, 2017, the magistrate found S.T. to be an "endangered child" pursuant to R.C. 2919.22. The magistrate also found that S.T. was abused, neglected, and dependent. A dispositional hearing was held on August 31, 2017, after which the magistrate made another reasonable effort finding on behalf of

---

[1] As a result of the unsafe and hazardous conditions at Mother's residence, both she and her boyfriend were arrested and charged with endangering children.

GCCS and granted the agency temporary custody of S.T.

{¶ 5} We note that in the early pendency of the case, GCCS created a case plan for Mother and Father whereby they could address the issues that led to the removal of the children from their care. The initial case plan for Mother included the following: 1) sign all releases of information; 2) obtain and maintain secure, safe, and stable housing; 3) perform household cleaning duties on a regular basis in order to prevent hazards in the home; 4) continue with mental health appointments and take medications as prescribed; 5) regularly attend S.T.'s specialized medical and educational appointments; 6) develop a better understanding of S.T.'s various medications and diagnoses; 7) complete parenting classes; 8) undergo a parenting-psychological evaluation; and 8) demonstrate the ability to provide for S.T.'s basic needs.

{¶ 6} GCCS caseworker Amanda Ray testified that prior to and during the pendency of the instant case, Father resided out-of-state in Kent County, Michigan. Ray testified that Father could not be included in the case plan because he lived in another state. Nevertheless, GCCS provided Father with a list of objectives for reunification with S.T.; which included the following: 1) sign all releases of information; 2) obtain and maintain secure, safe, and stable housing; 3) attend visitations with S.T.; and 4) attend S.T.'s medical and educational appointments. In January 2018, GCCS became aware that Father's other child, S.T.'s half-sibling, had been removed from Father's custody due to a report of domestic violence. Specifically, Father admitted to Ray that he struck the mother of his other child "because that's the only way she knows how to learn." Tr. 293. Thereafter, Father's list of objectives was expanded to include the following: 1) comply with the case plan created by the children's services agency in Kent County, Michigan;

2) attend parenting classes; 3) attend a domestic violence class and/or obtain a batterer's assessment.

{¶ 7} On June 5, 2018, GCCS filed a motion requesting permanent custody of S.T. At a review hearing held on June 21, 2018, the juvenile court found that GCCS had made reasonable efforts with respect to S.T., Mother, and Father, and ordered that S.T. remain in the temporary custody of GCCS pending the outcome of the permanent custody hearing.   On July 31, 2018, Mother filed a motion for an extension of temporary custody. On August 17, 2018, Father filed a motion for legal custody of S.T., or in the alternative a motion for extension of temporary custody with GCCS.

{¶ 8} A permanent custody hearing was held before the juvenile court over two days on August 30, 2018, and November 27, 2018.   After hearing testimony from witnesses called by GCCS, Mother, and Father, and viewing the evidence adduced by the parties, the juvenile court granted GCCS's motion for permanent custody, thereby terminating the parental rights of Mother and Father.

{¶ 9} It is from this judgment that Mother and Father separately appeal.

## Mother's Appeal

{¶ 10} Mother's sole assignment of error is as follows:

THE TRIAL COURT ERRED IN PERMITTING THE EXPERT OPINION TESTIMONY.

{¶ 11} Mother contends that the trial court erred in permitting the expert opinion testimony of Dr. Casey Kelliher, the psychologist who conducted Mother's parenting-psychological evaluation.   Dr. Kelliher also testified as an expert in psychology and parenting evaluation without objection.   Specifically, Mother argues that Dr. Kelliher's

testimony should have been excluded "because his opinions were not to a reasonable degree of psychological certainty."

{¶ 12} Initially, we note that neither Mother nor Father objected at the permanent custody hearing to the admission of Dr. Kelliher's testimony, to his qualifications, or to any failure to move for his designation as an expert. "Normally, the failure to timely object at trial to allegedly inadmissible evidence waives all claims of error except for plain error." (Citation omitted.) *State v. Bahns*, 185 Ohio App.3d 805, 2009-Ohio-5525, 925 N.E.2d 1025, ¶ 19 (2d Dist.). Plain error does not exist "unless, but for the error, the outcome of the trial clearly would have been otherwise. Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978). After reviewing the record, we see no error or plain error justifying reversal based on Dr. Kelliher's testimony.

{¶ 13} Under Evid.R. 702, a witness may testify as an expert if "(A)The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; and (C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

{¶ 14} It is well-established that an expert witness need not be the best witness on the subject. *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 159, 383 N.E.2d 564 (1978). "The test of admissibility is whether a particular witness offered as an expert will aid the trier of fact in the search of the truth." *Ishler v. Miller*, 56 Ohio St.2d 447, 453, 384

N.E.2d 296 (1978).

{¶ 15} In *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998), the Supreme Court of Ohio designated the following four factors, adopted from *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-594, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to be considered in evaluating the reliability of scientific evidence: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance. *Miller* at 611, citing *Daubert* at 593-594. Both the United States Supreme Court in *Daubert* and the Supreme Court of Ohio in *Miller* emphasized that none of the factors is determinative: 'the focus is "solely on principles and methodology, not on the conclusions that they generate." *Miller* at 613, citing *Daubert* at 595. "Thus, there is no requirement that an expert utter any 'magic language;' *i.e.* that his opinion was within the reasonable degree of certainty or reasonable degree of certainty within the particular knowledge of his professional experience." *Coe v. Young*, 145 Ohio App.3d 499, 504. 763 N.E.2d 652 (11th Dist.2001).

{¶ 16} In the instant case, Dr. Kelliher provided factual testimony, not opinion testimony, regarding Mother's actions and inactions with respect to level of care she provided S.T. when he was in her custody. Specifically, Dr. Kelliher testified regarding background information relayed to him by GCCS that Mother was inconsistent in her administration of medications, regularly ran out of medications, was confused by the instructions for administering the medications, and that many of S.T.'s medications in her home had expired. Dr. Kelliher testified about factual information he received from S.T.'s school that Mother failed to give S.T.'s his medications prior to school. Additionally, Dr.

Kelliher testified that he received information that Mother had trouble providing S.T.'s doctors and other staff with correct and reliable information regarding the effectiveness of S.T.'s medications and/or if the medications were being administered correctly. Mother herself testified that she had difficulties with getting S.T. to his medical appointments and had trouble administering his medications correctly.

{¶ 17} With respect to the juvenile court's discussion of Mother's mental health issues in its judgment entry, that information was available from Mother's TCN Behavioral Health records, which were certified and admitted as Exhibit C. Furthermore, Mother testified that she missed several appointments with her TCN counselor and had not been taking her medications as prescribed. Ray testified that Mother also admitted that she often ran out of her medications, and was "halving" or quartering the pills to make them last longer. There is no evidence in the record that the trial court improperly relied upon any of Dr. Kelliher's opinions when it recited Mother's mental issues in the judgment entry.

{¶ 18} The record also supports the trial court's finding that Mother had "diminished parenting abilities," irrespective of Dr. Kelliher's testimony. While Dr. Kelliher ultimately testified that GCCS should be granted permanent custody of S.T., the trial court did not cite to or specifically rely on Dr. Kelliher's recommendation when it issued its judgment entry terminating Mother and Father's parental rights. Appellate courts presume that a trial court only considered relevant and admissible evidence in a bench trial. *See White v. White*, 2d Dist. Clark No. 2013 CA 86, 2014-Ohio-1288, ¶ 11 ("when conducting a bench trial, the trial court is presumed to have considered only admissible evidence unless the record indicates otherwise"). As previously stated, the record is replete with factual evidence, including the testimony of Mother regarding her inability to provide

adequate care, which supported the juvenile court's decision to grant permanent custody of S.T. to GCCS.

{¶ 19} Upon review, we conclude that to the extent Dr. Kelliher testified regarding his opinions but not to a reasonable degree of psychological certainty, the record fails to establish that the trial court relied on said opinions in any way in its findings of fact or in its decision to award GCCS permanent custody of S.T. Furthermore, the majority of the factual information credited to Dr. Kelliher was also presented in the testimony of other witnesses such as Amanda Ray, as well as indicated in exhibits that were admitted during the hearing. Accordingly, even if the juvenile court failed to disregard any of the improper opinion testimony of Dr. Kelliher, the error was harmless and certainly did not rise to the level of plain error.

{¶ 20} Mother's sole assignment of error is overruled.

**Father's Appeal**

{¶ 21} Father's sole assignment of error is as follows:

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF

S.T. TO GCCS.

{¶ 22} Father argues that the trial court erred when it awarded permanent custody of S.T. to GCCS, thereby terminating his parental rights. Specifically, Father contends that the trial court erred when it found the following: 1) that S.T. could not be placed with Father within a reasonable time; 2) that Father abandoned S.T. pursuant to R.C. 2151.414; 3) that GCCS made reasonable efforts to prevent the continued removal of S.T. from Father; and 4) that a grant of permanent custody to GCCS was in S.T.'s best interest.

{¶ 23} The United States Supreme Court has described the interest of parents in the care, custody, and control of their children as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The Ohio Supreme Court has recognized that "there is an essential and basic civil right to conceive and raise children." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 39. However, "[t]he fundamental interest of parents is not absolute." *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. "The state has broad authority to intervene to protect children from abuse and neglect." *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Prob. Div.*, 150 Ohio St.3d 230, 2016-Ohio-7382, 81 N.E.3d 380 ¶ 58 (O'Connor, C.J., dissenting), citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28.

{¶ 24} The termination of parental rights is governed by R.C. 2151.414. Division (B)(1) of that statute requires a court to determine, "by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody," and that certain other conditions apply. Clear and convincing evidence has been defined as " 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases,' " and which will produce in the mind of the trier of fact " 'a firm belief or conviction as to the facts sought to be established.' " *In re K.H.* at ¶ 42, *quoting Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 25} A court's decision to terminate parental rights will not be overturned "if the record contains competent, credible evidence by which the court could have formed a

firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted.) *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. "We review the trial court's judgment for an abuse of discretion." *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 14, citing *In re C.F.* at ¶ 48 (applying the abuse-of-discretion standard to trial court's findings under R.C. 2151.414).

**Placement with Father within a Reasonable Time**

{¶ 26} A two-part test applies to determine whether to grant a public children services agency's motion for permanent custody. R.C. 2151.414(B)(1) provides that a court may grant permanent custody if it clearly and convincingly finds that (1) the child's best interest lies in granting permanent custody to the agency, and (2) any of the statutory alternatives apply, one of which is that the child has been abandoned pursuant to R.C. 2151.414(B)(1)(b).

{¶ 27} R.C. 2151.414 provides in relevant part as follows:

(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-

month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

* * *

R.C. 2151.011(C) provides that "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."

{¶ 28} R.C. 2151.414 further provides:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with

either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(10) The parent has abandoned the child.

{¶ 29} As previously stated, Father admitted during his testimony that he had no contact with S.T. since 2010 when the child was nine months old. Father testified that this was because Mother had moved with the child to Ohio in 2010 without providing him any contact information, leaving Father unable to contact S.T. for five years after Mother moved. Conversely, Mother testified that Father was fully aware of the location of her residence in Ohio since she had to obtain permission from a Michigan court in order to relocate to Ohio. Mother further testified that Father was advised of the location of her new Ohio residence through the Michigan court process. Furthermore, Mother testified

that while there was never any face-to-face contact between Father and S.T. during this time period, there were some phone calls and video chats, "but not very many."

{¶ 30} Additionally, Father testified that he was unable to miss work in order to drive to Ohio to visit S.T. However, Father later conceded that he did in fact have time to visit from June 2017 until March 2018, during which time he was unemployed. Although the Visitation Center charged a fee for visiting S.T., GCCS offered Father gas cards to make the trip to Ohio, of which he never took advantage. Even though he was not on the case plan because he lived in another state, GCCS also continually informed him of S.T.'s medical and educational appointments, which he failed to attend. Furthermore, when Father was provided the opportunity to attend visits with S.T. scheduled around the court hearings in the instant case (which he did attend), Father failed to avail himself of the opportunity to meet with his son.

{¶ 31} In its judgment entry granting permanent custody of S.T. to GCCS, the juvenile court stated the following in relevant part:

The Court finds, by clear and convincing evidence, that [S.T.], is an abandoned child pursuant to O.R.C. § 2151.414(B)(1)(b), as defined in O.R.C. § 2151.011(C). The Court further finds that GCCS has had continuous custody of [S.T.], since June 20, 2017, thus satisfying O.R.C. § 21511.414(B)(1)(a). * * *

{¶ 32} When making a determination regarding whether a minor child can be placed with a parent within a reasonable time, one of the factors the court is to consider is whether the parent has abandoned the child. R.C. 2151.414(E)(10). In the instant case, the evidence adduced at the custody hearing established that Father had little to

no contact with S.T. since the child was nine months old.  Additionally, during the course of the instant proceedings, when Father was provided the opportunity to visit with and attempt to form a bond with S.T., he failed to avail himself of the opportunity in every instance.  We note that the juvenile court explicitly found the relationship between Father and S.T. to be "nonexistent." Judgment Entry p. 3.  Furthermore, the record establishes that Father failed to obtain and maintain stable housing, and that during the pendency of this case, Father had another child removed from his home because of domestic violence allegations against him.  Having reviewed all the evidence, we cannot conclude that the juvenile court's determination that Father abandoned S.T. was unsupported by clear and convincing evidence.  Furthermore, the trial court did not err when it found that S.T. could not be placed with Father within a reasonable time.

**Whether GCCS made reasonable efforts to prevent the continued removal of S.T. from Father**

{¶ 33} Here, Father argues that the record establishes that GCCS failed to make reasonable efforts to prevent the continued removal of S.T.  With regard to the reunification requirement, this Court noted as follows:

> * * * "Reasonable efforts are described as being a good faith effort which is 'an honest, purposeful effort, free of malice and the desire to defraud or to seek an unconscionable advantage.' " *In re Cranford* (July 24, 1998), Montgomery App. Nos. 17085 and 17105, citing *In re Weaver* (1992), 79 Ohio App.3d 59, 606 N.E.2d 1011. "The issue is not whether [the agency] could have done more, but whether it did enough to satisfy the 'reasonableness' standard under the statute." [Citation omitted].

*In re Secrest*, 2d Dist. Montgomery No. 19377, 2002-Ohio-7096, ¶ 13.

{¶ 34} Initially, we note that "[b]y its terms, R.C. 2151.419 applies only at hearings held pursuant to R.C. 2151.28, 2151.31(E), 2151.314, 2151.33, or 2151.353. See R.C. 2151.419(A)(1)." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 41. The statute makes no reference to a hearing on a motion for permanent custody. *Id.* Therefore, "[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414." *Id.*, citing *In re A.C.*, 12th Dist. Clermont No. CA2004-05-041, 2004-Ohio-5531. Accordingly, GCCS was not required to adduce evidence establishing reasonable efforts to reunify the family during the permanent custody hearing if the record established that GGCS made reasonable efforts to reunify the family during prior custody proceedings. *Id.* at ¶ 43.

{¶ 35} In the instant case, the record establishes that GCCS made reasonable efforts to prevent the continued removal of S.T. and to reunify the family at proceedings which were held prior to the permanent custody hearing: the shelter care hearing, (Entry, June 6, 2017); the dispositional hearing (Magistrate's Decision, August 31, 2017); and the review hearing (Magistrate's Decision, June 21, 2018). Therefore, the GCCS was not required to establish at the permanent custody hearing that it made reasonable efforts to prevent the removal of S.T. from Father. *See In re C.F.* at ¶ 43.

{¶ 36} Nevertheless, even though it was under no requirement to do so, GCCS still presented competent and credible evidence at the permanent custody hearing that it had made reasonable efforts to prevent the removal of S.T. from both Mother and Father. Specifically, GCCS created a case plan for Mother which included the following: 1) sign

all releases of information; 2) obtain and maintain secure, safe, and stable housing; 3) perform household cleaning duties on a regular basis in order to prevent hazards in the home; 4) continue with her mental health appointments and take her medications as prescribed; 5) regularly attend S.T.'s specialized medical and educational appointments; 6) develop a better understanding of S.T.'s various medications and diagnoses; 7) complete parenting classes; 8) undergo a parenting-psychological evaluation; and 8) demonstrate the ability to provide for S.T.'s basic needs.

{¶ 37} Even though Father lived out-of-state and was not included in the case plan, GCCS provided Father with a list of objectives for reunification with S.T. which included the following: 1) sign all releases of information; 2) obtain and maintain secure, safe, and stable housing; 3) attend visitations with S.T.; and 4) attend S.T.'s medical and educational appointments. When GCCS became aware that Father's other child had been removed from Father's custody due to a report of domestic violence, Father's list of objectives was expanded to include the following: 1) comply with the case plan created by the children's services agency in Kent County, Michigan; 2) attend parenting classes; 3) attend a domestic violence class and/or obtain a batterer's assessment.

{¶ 38} Father argues that GCCS did not do enough to facilitate visitation with S.T. because he lived out-of-state and could not afford the $75 fee at the Visitation Center. Father also asserts that GCCS did not give him any gas cards to travel to Ohio to visit S.T. However, Amanda Ray testified that she personally offered to give gas cards to Father so that he could visit S.T. and attend the child medical and educational appointments. " 'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how

remote, may have made reunification possible." *In re A.T.*, 2d Dist. Montgomery Nos. 28332 and 28355, 2019-Ohio-3527, ¶ 74, *quoting In re K.M.*, 12th Dist. Butler No. CA 2004-02-052, 2004-Ohio-4152, ¶ 23.

{¶ 39} Upon review, we conclude that the record establishes that GCCS did make reasonable efforts to reunify the family prior to moving for permanent custody of S.T. Father failed to establish that GCCS could have made any additional efforts to reunify him with S.T., especially when Father made no effort to facilitate even a single visit with S.T. Thus, the record supports the juvenile court's finding that GCCS made reasonable efforts to prevent the continued removal of S.T. and reunify the child with Father.

### Whether Permanent Custody to GCCS was in S.T.'s Best Interest

{¶ 40} In determining a child's best interest, R.C. 2151.414 instructs courts to consider "all relevant factors," including five statutory factors:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1). "No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57. The juvenile court here considered each of these factors.

{¶ 41} The evidence adduced at the permanent custody hearing supported the juvenile court's finding that Mother's relationship with S.T. was "dysfunctional." Judgment Entry p. 3. Based upon her own personal observations, Ray testified that Mother's relationship with S.T. reflected "more of two children than it is of a parent and child," thereby requiring constant supervision. As previously stated, Dr. Kelliher testified regarding background information relayed to him by GCCS that Mother was inconsistent in her administration of medications, regularly ran out of medications, was confused by the instructions for administering the medications, and that many of S.T.'s medications in her home had expired. Dr. Kelliher testified about factual information he received from S.T.'s school that Mother failed to give S.T. his medications prior to school. Additionally, Dr. Kelliher testified that he received information that Mother had trouble providing S.T.'s doctors and other staff with correct and reliable information regarding the effectiveness of S.T.'s medications and/or if the medications were being administered correctly.

{¶ 42} Mother herself testified that she had difficulties with getting S.T. to his medical appointments and had trouble administering his medications correctly. Mother also testified that she missed several appointments with her TCN counselor and had not been taking her medications as prescribed. Ray testified that Mother also admitted that she often ran out of her medications, and was "halving" or quartering the pills to make them last longer.

{¶ 43} With respect to Father, the record established that Father had no contact

with S.T. since 2010 when the child was nine months old and had abandoned the child. Although Father testified that he was unable to miss work in order to drive to Ohio in order to visit S.T., he later conceded that he did in fact have time to visit from June 2017 until March 2018, during which time he was unemployed. Although the Visitation Center charged a fee for visiting S.T., GCCS offered Father gas cards to make the trip to Ohio, of which he never took advantage. Even though he was not on the case plan because he lived in another state, GCCS also continually informed of him of S.T.'s medical and educational appointments, which he failed to attend. When Father was provided the opportunity to attend visits with S.T.'s scheduled around the court hearings in the case (which he did attend), Father failed to avail himself of the opportunity to meet with his son. Simply put, made no attempt to personally visit with S.T. during the pendency of the instant case.

{¶ 44} Although Mother's cousin had known S.T. for a short time in the past and initially exhibited some interest in taking custody of S.T., at the time of the permanent custody hearing, the cousin was no longer returning calls from GCCS. For his part, Father did not identify any paternal relatives who had a relationship with S.T. The juvenile court acknowledged that the guardian ad litem's (GAL) report indicated that S.T. wished to be in Mother's custody, but S.T. would provide no response to the GAL when asked if he wished to live with Father.

{¶ 45} With respect to S.T.'s need for legally secure permanent placement, the record supports the juvenile court's findings that this could not be achieved without a permanent award of custody to GCCS. Mother testified that she had no suitable housing for S.T. While Father testified that he had suitable, stable, independent housing for S.T.,

Ray testified that the only evidence Father ever provided was a crumpled piece of notebook paper, written in pencil and allegedly signed by his mother. Upon further investigation, Ray received information from a Michigan children's services agency that Father did not live at the address he provided for the interstate home study. Rather, when his other child was removed after the domestic violence arrest, Father was found to be living at his parents' residence.

{¶ 46} Although sporadically employed full-time at various jobs, Father never provided any support, financial or otherwise, to S.T. In fact, Father testified that he was unaware of how to provide financial support to a dependent residing in another state. Although he did obtain a batterer's assessment, Father failed to engage in any of the visitation services provided by GCCS, and he never attended a single medical or educational appointment. Finally, the GAL indicated that S.T.'s best interest would be served by granting permanent custody to GCCS.

{¶ 47} A juvenile court's decision on termination will not be overturned "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, at ¶ 15. Furthermore, "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact." *In re A.J.S.*, 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 22. The "rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co.,*

*Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *In re J.Y.*, 2d Dist. Miami No. 07-CA-35, 2008-Ohio-3485, ¶ 33.

{¶ 48} Our review of the record reveals that there was clear and convincing evidence which supported the juvenile court's finding that the statutory elements for termination under R.C. 2151.414(B) had been satisfied. Thus, the juvenile court did not err when it awarded permanent custody of S.T. to GCCS.

{¶ 49} Father's sole assignment of error is overruled.

{¶ 50} Mother's and Father's assignments of error having been overruled, the judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and FROELICH, J., concur.

Copies sent to:

Nathaniel R. Luken
Sean Brinkman
Robert Alan Brenner
Christopher Smith
Mari McPherson
Hon. Adolfo A. Tornichio